[853 NE2d 610, 820 NYS2d 199]

In the Matter of Shondel J., Respondent, v Mark D., Appellant.

Argued May 11, 2006; decided July 6, 2006

**POINTS OF COUNSEL**

*Ann L. Detiere,* New York City, for appellant. I. Appellant is not a legal parent. (*Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Matter of Michael B.,* 80 NY2d 299; *Troxel v Granville,* 530 US 57; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Michael H. v Gerald D.,* 491 US 110; *Matter of Cindy P. v Danny P.,* 206 AD2d 615; *Matter of C.M. v C.H.,* 6 Misc 3d 361; *Matter of Lee P.S. v Lisa L.,* 301 AD2d 606.) II. Appellant did not equitably adopt the child. (*Matter of Baby Boy C.,* 84 NY2d 91; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Matter of Robert Paul P.,* 63 NY2d 233; *Matter of Mazzeo,* 95 AD2d 91; *Matter of D.S.,* 160 Misc 2d 331; *Matter of Male Infant L.,* 282 AD2d 534; *Rodriguez v Morris,* 136 Misc 2d 103; *Middleworth v Ordway,* 191 NY 404; *Gavin v Aitken,* 258 NY 595; *Matter of Thorne,* 155 NY 140.) III. DNA testing is legally decisive of paternity. (*Matter of Betty O. v Joseph O.,* 222 AD2d 508; *Matter of Baby Boy C.,* 84 NY2d 91; *Matter of Sharon GG. v Duane HH.,* 95 AD2d 466; *Matter of Sandra S. v Larry W.,* 175 Misc 2d 122; *Matter of Diana E. v Angel M.,* 20 AD3d 370; *Matter of Montelone v Antia,* 60 AD2d 603; *Matter of Michael B.,* 80 NY2d 299; *Pickett v Brown,* 462 US 1; *Matter of Greene v Giles,* 286 AD2d 390; *Matter of June B. v Edward L.,* 69 AD2d 612.) IV. Equitable paternity is unconstitutional. (*Little v Streater,* 452 US 1; *Michael H. v Gerard D.,* 491 US 110; *Matter of Corey L v Martin L,* 45 NY2d 383; *Troxel v Granville,* 530 US 57; *Matter of Michael B.,* 80 NY2d 299; *Prowda v Wilner,* 217 AD2d 287; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Matter of Raquel Marie X.,* 76 NY2d 387; *Matter of M./B. Children,* 7 Misc 3d 272; *Matter of C.M. v C.H.,* 6 Misc 3d 361.) V. Equitable relief is improper. (*Matter of Erie County Dept. of Social Servs. v Greg G.,* 273 AD2d 919; *Matter of Eugene F.G. v Darla D.,* 261 AD2d 958; *Matter of Oneida County Dept. of Social Servs. v Joseph C.,* 289 AD2d 1077; *Mat-*

*ter of Baby Boy C.,* 84 NY2d 91.) VI. The Family Court lacked subject matter jurisdiction. (*Chiacchia & Fleming v Guerra,* 309 AD2d 1213; *Sangiacomo v County of Albany,* 302 AD2d 769; *Matter of Delgado v Howell,* 74 AD2d 848; *Matter of Cattaraugus County Commr. of Social Servs. v Bund,* 259 AD2d 973; *Matter of Harriet II. v Alex LL.,* 292 AD2d 92; *Lepkowski v State of New York,* 1 NY3d 201; *Matter of Allegany County Dept. of Social Servs. v Thomas T.,* 273 AD2d 916; *Matter of Stortecky v Mazzone,* 85 NY2d 518; *Gager v White,* 53 NY2d 475; *Rose v Horton Med. Ctr.,* 5 AD3d 459.) VII. Restitution and legal fees are proper upon any reversal. (*Stone v Stone,* 152 AD2d 560; *Parise v Parise,* 13 AD3d 504.)

*Steven P. Forbes,* Jamaica, for respondent. I. The plain language of the Family Court Act compels the conclusion that the Family Court did not lack subject matter jurisdiction to declare appellant the father under the doctrine of equitable estoppel. II. Equitable estoppel is legislatively mandated and constitutionally serves the best interests of the child. (*Jean Maby H. v Joseph H.,* 246 AD2d 282; *Little v Streater,* 452 US 1; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Sean H. v Leila H.,* 5 Misc 3d 315; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Matter of Multari v Sorrell,* 287 AD2d 764; *Matter of Lynda A.H. v Diane T.O.,* 243 AD2d 24; *Anonymous v Anonymous,* 20 AD3d 333; *Matter of Ronald FF. v Cindy GG.,* 70 NY2d 141; *Matter of Sarah S. v James T.,* 299 AD2d 785.) III. The record fully supports the Family Court's determination that appellant should be declared the father of the subject child under the doctrine of equitable estoppel. (*Matter of St. Lawrence County Dept. of Social Servs. v Terry E.,* 229 AD2d 672; *Matter of Albany County Dept. of Social Servs. v Clarence KK.,* 210 AD2d 754; *Jean Maby H. v Joseph H.,* 246 AD2d 282.) IV. Restitution and legal fees are not appropriate upon any reversal. (*Matter of Colicci v Ruhm,* 20 AD3d 891; *Matter of Dower v Niewiadomski,* 286 AD2d 948; *Baraby v Baraby,* 250 AD2d 201; *Grossman v Ostrow,* 33 AD2d 1006.)

*Children's Law Center,* Brooklyn (*Barbara H. Dildine, Carol Sherman* and *Janet Neustaetter* of counsel), Law Guardian. The doctrine of equitable estoppel, which is a statutory exception to the right to genetic testing in paternity and child support proceedings, is a vital tool for safeguarding the interests of children in such proceedings and was properly applied by the courts below in the instant case. (*Purificati v Paricos,* 154 AD2d 360; *Matter of Department of Social Servs. v Thomas J.S.,* 100 AD2d

119; *Schaschlo v Taishoff,* 2 NY2d 408; *Commissioner of Pub. Welfare v Koehler,* 284 NY 260; *Matter of Czajak v Vavonese,* 104 Misc 2d 601; *Albany County Dept. of Social Servs. v John T.,* 170 Misc 2d 506; *Levy v Louisiana,* 391 US 68; *Mills v Habluetzel,* 456 US 91; *Matter of L. Pamela P. v Frank S.,* 59 NY2d 1; *Matter of Weinberg v Omar E.,* 106 AD2d 448.)

*Louis Kiefer,* Hartford, Connecticut, for US Citizens against Paternity Fraud and another, amici curiae. I. Did the courts below err in failing to apply the equitable doctrine of unclean hands in this case involving paternity fraud? (*Levy v Braverman,* 24 AD2d 430; *Seagirt Realty Corp. v Chazanof,* 13 NY2d 282; *Verra v Bowman-Verra,* 266 AD2d 682.) II. Did the courts below err in applying equitable estoppel in a case involving paternity fraud? (*Matter of Sharon GG. v Duane HH.,* 63 NY2d 859; *Matter of Christopher S. v Ann Marie S.,* 173 Misc 2d 824; *Department of Social Servs. v Dinkins,* 110 Misc 2d 673; *Matter of Cortland County Dept. of Social Servs. v Thomas ZZ.,* 141 AD2d 119; *Queal v Queal,* 179 AD2d 1070.) III. Did the courts below err by failing to consider the rights of the child to have the correct identification of her biological father and to have the benefits which would flow from that? (*Little v Streater,* 452 US 1; *Rivera v Minnich,* 483 US 574; *Matter of Brian M. v Nancy M.,* 227 AD2d 404; *Weiss v Weiss,* 52 NY2d 170; *Pickett v Brown,* 462 US 1; *Prince v Massachusetts,* 321 US 158; *Matter of Baby Boy C.,* 84 NY2d 91; *Matter of Emanuel S. v Joseph E.,* 78 NY2d 178; *Troxel v Granville,* 530 US 57; *Parham v J.R.,* 442 US 584.) IV. Did the courts below err in applying the "best interests" doctrine in assigning paternity to a nonbiological father? (*Matter of Cindy P. v Danny P.,* 206 AD2d 615; *Matter of C.M. v C.H.,* 6 Misc 3d 361; *Matter of Janis C. v Christine T.,* 294 AD2d 496; *Matter of Alison D. v Virginia M.,* 77 NY2d 651; *Matter of Bessette v Saratoga County Commr. of Social Servs.,* 209 AD2d 838; *Matter of David M. v Lisa M.,* 207 AD2d 623; *Matter of John Andrew B. v Dianna Marie McC.,* 149 Misc 2d 249; *Matter of Multari v Sorrell,* 287 AD2d 764; *Matter of Fitzpatrick v Youngs,* 186 Misc 2d 344; *Lassiter v Department of Social Servs. of Durham Cty.,* 452 US 18.) V. Did the courts below err in failing to make a meaningful inquiry into the identity and whereabouts of the biological father before effectively terminating any future the child might have with her father? (*Matter of Department of Social Servs. v Witzel,* 91 Misc 2d 274; *Little v Streater,* 452 US 1; *Prince v Massachusetts,* 321 US 158; *Lassiter v Department of Social Servs. of Durham Cty.,* 452 US 18; *Santosky v Kramer,* 455 US 745; *Matter of Daley,*

123 Misc 2d 139.) VI. Did the courts below err in failing to consider the long-term implications of imposing fatherhood on a man who has no interest in being a father? (*Matter of Charles v Charles*, 296 AD2d 547; *Matter of Bennett v Jeffreys*, 40 NY2d 543; *Hammack v Hammack*, 291 AD2d 718.)

### OPINION OF THE COURT

ROSENBLATT, J.

In this child support proceeding, we hold that a man who has mistakenly represented himself as a child's father may be estopped from denying paternity, and made to pay child support, when the child justifiably relied on the man's representation of paternity, to the child's detriment. We reach this conclusion based on the best interests of the child as set forth by the Legislature.

I.

In January 1996, Shondel J. gave birth to a daughter in Guyana, where she then resided, and in a birth registration document named Mark D. as the father. Shondel and Mark had dated the previous spring in Guyana and had sexual intercourse.

Although Mark was in New York when the child was born, he provided financial support for the child and returned to Guyana later in the year to see her. In a sworn statement, notarized by the Guyana Consul-General in New York in January 1996, Mark declared that he was "convinced" that he was the child's father and accepted "all paternal responsibilities including child support." In 1998 he signed a Guyana registry, stating that he was her father and authorizing the change of her last name to his. Mark named the child the primary beneficiary on his life insurance policy, identifying her as his daughter. He also sent Shondel money monthly for the child's support from her birth until June 1999 and then less regularly through the summer of 2000.

In August 2000, Shondel commenced a Family Court Act article 5 proceeding alleging that Mark is the father and seeking orders of filiation and support. Initially, Mark did not contest paternity. On the contrary, in September 2000, when the child was 4½ years old, Mark commenced a Family Court Act article 6 proceeding, seeking visitation. In his petition, he stated that he was the child's father, and that he loved her and wished to "spend quality time with her on a regularly scheduled basis."

In October 2000, however, when appearing before a Family Court hearing examiner to answer Shondel's petition, Mark

requested DNA testing. The hearing examiner ordered genetic marker tests, which revealed that Mark is not the child's biological father. The hearing examiner then dismissed Shondel's paternity petition, and Mark abandoned his petition for visitation, having severed his relationship with the child. Shondel objected to the hearing examiner's order, expressing doubts about the laboratory tests and stating that she would be able to show that Mark had always recognized the child as his. Realizing that the hearing examiner had exceeded her authority in dismissing Shondel's petition, Family Court sustained her objection and appointed a law guardian for the child.

In October 2001, the Law Guardian reported that Mark had acted as the father of the child, who in turn considered him her father. Family Court set the matter down for a trial on equitable estoppel and ordered another set of tests. A blood genetic marker test confirmed that Mark is not the child's biological father.

At the estoppel trial, Family Court heard widely diverging testimony from Shondel and Mark. According to Shondel's testimony, Mark spent time with her and the child when they traveled to the United States in 1996 and 1997, seeing them "every day" for about six weeks in the summer of 1997 in New York; continued to visit the child and take her out after his relationship with Shondel soured in 1998; bought the child toys, clothes and other gifts; took the child to meet his parents; told his family that she was his daughter; regularly spoke with the child by telephone; referred to himself as "daddy" when talking with the child; and visited the child "almost every other day" in August 1999 and "almost every other day" between the time Shondel and the child moved to New York in January 2000 and the commencement of this litigation.

Mark denied all of this, asserting that he had seen the child only four times since her birth; that he had not acknowledged the child as his; that he had not introduced the child to his family or friends as his child; that he had not sent the child birthday or Christmas gifts; and that he had never visited her. Mark testified that he twice asked Shondel to submit to a blood test to determine whether he was the father of her child. Shondel insisted that he did not.

Family Court believed Shondel "entirely" and found Mark's testimony incredible. It ruled that Mark "held himself out as [the] child's father, and behaved in every way as if he was the

father, albeit a father who didn't reside for a good part of the child's life, in the same country." These affirmed findings of Family Court have support in the record and are binding on this Court.

Family Court entered an order of filiation and awarded child support retroactive to the date Shondel commenced the Family Court proceeding. The Appellate Division affirmed, concluding that "Family Court properly determined that it was in the best interests of the subject child to equitably estop [Mark] from denying paternity" (6 AD3d 437 [2004]).[1] We agree, based on our precedents, the affirmed findings of fact and the legislative recognition of paternity by estoppel.

## II.

The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position (*see generally Nassau Trust Co. v Montrose Concrete Prods. Corp.*, 56 NY2d 175, 184 [1982]).

New York courts have long applied the doctrine of estoppel in paternity and support proceedings. Our reason has been and continues to be the best interests of the child (*Jean Maby H. v Joseph H.*, 246 AD2d 282, 285 [2d Dept 1998]; *see generally Matter of L. Pamela P. v Frank S.*, 59 NY2d 1, 5 [1983]).

Although it originated in case law, paternity by estoppel is now secured by statute in New York (*see* Family Ct Act § 418 [a]; § 532 [a]). For that reason, and contrary to Mark's assertions, it is not for us to decide whether the doctrine has a rightful place in New York law. Clearly it does, in the absence of legislative repeal or a determination of unconstitutionality. Mark argues for the first time in this appeal that sections 418 (a) and 532 (a) are unconstitutional and deprive him of due process. As this claim was not raised in the courts below, we do not entertain it.

---

1. This Appellate Division order is brought up for review here by Mark's appeal of a later Appellate Division order dismissing his objections to the child support order (18 AD3d 551 [2005]).

Equitable estoppel is gender neutral. In *Matter of Sharon GG. v Duane HH.* (63 NY2d 859 [1984], *affg* 95 AD2d 466 [3d Dept 1983]), we affirmed an order of the Appellate Division dismissing a paternity petition in which a mother sought to compel her husband to submit to a blood test as a means of challenging his paternity. We agreed with the Appellate Division that the mother should be estopped. As that Court pointed out, the mother expressed no question about her child's paternity until some 2¹/₂ years after the child's birth. She had held the child out as her husband's, accepted his support for the child while she and her husband lived together and after they separated, and permitted her husband and child to form strong ties together.

Estoppel may also preclude a man who claims to be a child's biological father from asserting his paternity when he acquiesced in the establishment of a strong parent-child bond between the child and another man. The rationale is that the child would be harmed by a determination that someone else is the biological father. For example, in *Purificati v Paricos* (154 AD2d 360 [2d Dept 1989]), a boy's biological father who did not seek to establish his paternity until more than three years after the child's birth, and who acquiesced as a relationship flourished between the boy and his mother's former husband, was estopped from claiming paternity. The courts "impose equitable estoppel to protect the status interests of a child in an already recognized and operative parent-child relationship" (*Matter of Baby Boy C.*, 84 NY2d 91, 102 n [1994]).

Finally, the Appellate Division has repeatedly concluded that a man who has held himself out to be the father of a child, so that a parent-child relationship developed between the two, may be estopped from denying paternity.[2] Where a child justifiably relies on the representations of a man that he is her father with the result that she will be harmed by the man's denial of paternity, the man may be estopped from asserting that denial.[3]

---

**2.** *Mancinelli v Mancinelli*, 203 AD2d 634 (3d Dept 1994); *Matter of Commissioner of Social Servs. of Tompkins County v Gregory B.*, 211 AD2d 956 (3d Dept 1995); *Brian B. v Dionne B.*, 267 AD2d 188 (2d Dept 1999); *Matter of Jennifer W. v Steven X.*, 268 AD2d 800 (3d Dept 2000); *Ocasio v Ocasio*, 276 AD2d 680 (2d Dept 2000); *Matter of Sarah S. v James T.*, 299 AD2d 785 (3d Dept 2002); *Matter of Diana E. v Angel M.*, 20 AD3d 370 (1st Dept 2005).

**3.** As one court put it, "[t]he law is not so insensitive as to countenance the breach of an obligation in so vital and deep a relation, undertaken, partially fulfilled, and suddenly sundered." (*Clevenger v Clevenger*, 189 Cal

### III.

Mark represented that he was the father of the child, and she justifiably relied on this representation, changing her position by forming a bond with him, to her ultimate detriment. He is therefore estopped from denying paternity.

Mark expressly represented that he was the father of Shondel's child in the notarized sworn statement and in the Guyana registry in which he gave the child his name, as well as in the visitation petition filed with Family Court. Further, Mark held himself out as the child's father, and behaved in every way as if he was the father. Mark and the child had a close relationship, in which he referred to himself as her "daddy," and which involved regular telephone conversations, frequent visits when she and Mark were in the same city, and contact with his parents. Moreover, Mark named the child as the primary beneficiary on his life insurance policy and sent money monthly for the child's support until June 1999 and then less regularly through the summer of 2000.

The record also establishes that the child justifiably relied on Mark's representations, accepting and treating him as her father. The Law Guardian's October 2001 oral report to Family Court on her interview with the child (conducted when she was 5½ years old) concluded that she

> "considers Mark [D.] to be her father. She enjoys spending time with him, she knew his name, she described what he looks like, different things about his appearance, she talked about some of the things they did together, she enjoyed the visits a lot, he brought her presents in the past, he took her out without the mother sometimes, there's a picture album with pictures of [Mark] in it and she wanted me to express that she misses him and she wants to know when he's going to come back to see her."

In the best interests of the child, Family Court properly applied estoppel, to impose support obligations on Mark, after he left the child with the detrimental effects of a relationship in which she was misled into believing that he was her father. A mother who had perfect foresight and knew that her child's relationship with a father figure would be severed when the child was 4½ might well choose never to inform him of her child's birth.

---

App 2d 658, 674, 11 Cal Rptr 707, 716 [Ct App 1961]; *accord Pietros v Pietros*, 638 A2d 545, 548 [RI 1994].)

## IV.

Mark attacks the statutory basis for the application of paternity by estoppel. In 1990, the Legislature amended Family Court Act § 418 (a), which governs the procedures related to scientific testing of biological paternity in support proceedings, so as to read, in pertinent part:

> "The court, on its own motion or motion of any party, when paternity is contested, shall order the mother, the child and the alleged father to submit to one or more genetic marker or DNA marker tests . . . to aid in the determination of whether the alleged father is or is not the father of the child. No such test shall be ordered, however, upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, *equitable estoppel* or the presumption of legitimacy of a child born to a married woman." (Family Ct Act § 418 [a] [emphasis supplied]; *see* L 1990, ch 818, § 12.)

Arguing that the statute is self-contradictory, Mark asserts that the law mandates scientific testing of biological paternity in support proceedings and then in the next sentence makes such tests discretionary. We view the statute differently.

By providing a limited "best interests of the child" exception to mandatory biological tests of disputed paternity, the statute requires Family Court to justify its refusal to order biological tests when paternity is in issue. Before the amendment, Family Court was authorized, but not required, to order biological tests, and the court did not have to justify its refusal to do so. Now, in a support proceeding in which paternity is disputed, Family Court must explain why it denies a motion for biological paternity testing. The court may deny testing based on "res judicata, equitable estoppel or the presumption of legitimacy of a child born to a married woman," if denial is in the best interests of the child.

It is true that a child in a support proceeding has an interest in finding out the identity of her biological father. But in many instances a child also has an interest—no less powerful—in maintaining her relationship with the man who led her to believe that he is her father. The 1990 amendment to Family Court Act § 418 (a) appropriately balances these interests in accordance with the primary purpose of the Family Court Act—to protect and promote the best interests of children.

The procedure contemplated by section 418 (a) is that Family Court should consider paternity by estoppel before it decides whether to test for biological paternity. Here, the process was inverted early in the proceeding. Instead of referring the matter to a Family Court judge, the hearing examiner ordered genetic marker tests of paternity when the parties appeared in October 2000. As a result, the child's biological paternity had been addressed before Family Court conducted its trial on the issue of estoppel. Nevertheless, even though the tests had been conducted, Family Court was authorized to decide the estoppel issue.

## V.

In allowing a court to declare paternity irrespective of biological fatherhood, the Legislature made a deliberate policy choice that speaks directly to the case before us. The potential damage to a child's psyche caused by suddenly ending established parental support need only be stated to be appreciated. Cutting off that support, whether emotional or financial, may leave the child in a worse position than if that support had never been given. Situations vary, and the question whether extinguishing the relationship and its attendant obligations will disserve the child is one for Family Court based on the facts in each case. Here, Family Court found it to be in the best interests of the child that Mark be declared her father and the Appellate Division properly affirmed.

Asserting that the equities are with Mark, our dissenting colleagues argue that we do not acknowledge the fraud or misrepresentation exception to the doctrine of equitable estoppel. This argument is misplaced for three reasons. To begin with, the child is the party in whose favor estoppel is being applied and there can be no claim here that she was guilty of fraud or misrepresentation. Secondly, to the extent that it matters, we note that there is no evidence of fraud or willful misrepresentation even on Shondel's part. It is not likely that she would have initiated paternity proceedings, with the predictable prospect of biological testing, if she expected tests to rule him out as the father. There is every reason to believe that she thought Mark was the biological father and that the tests would confirm her belief. Finally, the issue does not involve the equities between the two adults; the case turns exclusively on the best interests of the child.

We appreciate the dissenters' concern over applying estoppel to a case in which, as between Mark and Shondel, it was she

who misrepresented Mark to be the father (even though she may have earnestly believed he was). The dissenters' position, however, appears not to recognize that fatherhood by estoppel does not contemplate a contest between two adults to see who is the more innocent. The child is entirely innocent and by statute the party whose interests are paramount.

To the child, Mark represented himself as her father. The Legislature did not create an exception for men who take on the role of fatherhood based on the mother's misrepresentation. That would eviscerate the statute and, with it, the child's best interests. Under the enactment, the mother's motivation and honesty are irrelevant; the only issue for the court is how the interests of the child are best served.

Here, Family Court found, and the Appellate Division affirmed, that Mark represented himself to be the father and that the child's best interests would be served by a declaration of fatherhood. Under our decisional law, and contrary to the dissenters' suggestion, equitable estoppel does not require that Mark, to be estopped, necessarily knew that his representation was false. A party who, like Mark, does not realize that his representation was factually inaccurate may yet be estopped from denying that representation when someone else—here the child—justifiably relied on it to her detriment (*see Romano v Metropolitan Life Ins. Co.*, 271 NY 288, 293-294 [1936]; *Triple Cities Constr. Co. v Maryland Cas. Co.*, 4 NY2d 443, 448 [1958]).

The dissenters cite *Simcuski v Saeli* (44 NY2d 442 [1978]), which holds that a defendant may be estopped to plead the statute of limitations after having wrongfully induced the plaintiff to refrain from filing a timely suit. *Simcuski* prevents defendants from profiting from their misconduct. It does not bear on estoppel as between a man and the child with whom he has formed a father-daughter relationship.

Our dissenting colleagues point out that Mark has renounced fatherhood and now has no relationship with the child. This state of affairs, however, does not preclude the application of estoppel. If it did, a man could defeat the statute simply by severing all ties with the child.

Given the statute recognizing paternity by estoppel, a man who harbors doubts about his biological paternity of a child has a choice to make. He may either put the doubts aside and initiate a parental relationship with the child, or insist on a scientific test of paternity *before* initiating a parental relationship. A

possible result of the first option is paternity by estoppel; the other course creates the risk of damage to the relationship with the woman. It is not an easy choice, but at times, the law intersects with the province of personal relationships and some strain is inevitable. This should not be allowed to distract the Family Court from its principal purpose in paternity and support proceedings—to serve the best interests of the child.

Accordingly, the order of the Appellate Division should be affirmed, without costs.

G.B. Smith, J. (dissenting). The issue in this case is whether an individual nonspouse who was falsely told he was the biological father of a child and who DNA tests show could not be the biological father can be equitably estopped from denying paternity. A man or woman is and should be responsible for the financial support of his or her own offspring. In some instances, this responsibility may be placed upon a nonbiological parent. The facts in this case do not justify such a result. Because the "best interests of the child" require more than financial support, and equitable estoppel should be applicable only to someone who engages in false conduct, I dissent.

In 1995, while on a trip to Georgetown, Guyana, respondent Mark D. met and engaged in sexual intercourse with the petitioner, Shondel J. Following his return to the United States, Shondel J. told respondent she was pregnant and he began financially supporting petitioner. In 1996, respondent signed documents submitted to the Guyanese Consul that declared him to be the father of the child. He claims that he did this in order for petitioner to travel to the United States and submit to a paternity test. Between 1996 and 2000, when petitioner moved to New York, Mark D. saw the child multiple times during two visits to Guyana and a visit to Chicago. In 1997, he named the child as a beneficiary on his life insurance policy.

In 2000, Shondel J. commenced a Family Court proceeding in New York to declare Mark D. the child's father and to obtain an order of support. Family Court ordered DNA tests at Mark D.'s request and the DNA saliva swab test excluded paternity. In 2001, Family Court dismissed Shondel J.'s petition and she filed objections to the order of dismissal, alleging that the DNA test was erroneous. In November 2001, the results of a new blood test showed respondent was not the biological father. On August 8, 2002, in Family Court, Kings County, respondent was declared the child's father on the verified petition originally filed by petitioner. The court stated:

> "The essence of the paternity trial was really one of equitable estoppel, should [Mark D.] be estopped from denying paternity. . . . I do find the Petitioner to have been entirely credible, and with all due respect, except in one regard, [Mark D.] entirely incredible.

> "I do believe that he had doubts, however, he didn't act on them in the appropriate fashion, and as a result he held himself out as this child's father, and behaved in every way as if he was the father, albeit a father who didn't reside for a good part of the child's life, in the same country.

> "However, it's clear to me that these families were involved with each other, involved with this child, that his parents and probably other friends and relatives and church members were aware of this relationship, were aware of this child . . . .

> "I would assume that for the best—and hope that for the best interests of the child, that he could pick up where he left off, and accept this child wholeheartedly into his life, because the child certainly wants that, and really, what's paramount here is what the child needs."

On April 5, 2004, the Appellate Division, Second Department affirmed the Family Court's order of filiation. On May 9, 2005, the Second Department dismissed respondent's appeal from a Family Court order of retroactive child support, and affirmed an order of support against him.

The question here is not, as the majority suggests, whether equitable estoppel "has a rightful place in New York law" (majority op at 326) or in paternity proceedings. The statute makes clear that it does. The question is whether the elements of estoppel are present in this case. Equitable estoppel is a "defensive doctrine preventing one party from taking unfair advantage of another when, through false language or conduct, the person to be estopped had induced another person to act in a certain way, with the result that the other person has been injured in some way" (Black's Law Dictionary 571 [7th ed 1999]; *see also Simcuski v Saeli*, 44 NY2d 442, 449 [1978] [stating defendant may be equitably estopped "where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action" and plaintiff demonstrates reasonable reliance on

defendant's misrepresentations]). Once a party makes a prima facie showing of facts sufficient to support equitable estoppel in the paternity context, the opponent of equitable estoppel must demonstrate why estoppel should not be applied in the best interests of the child (*see Matter of Sharon GG. v Duane HH.,* 95 AD2d 466 [3d Dept 1983], *affd* 63 NY2d 859 [1984]).

According to Family Court Act § 532 (a), which is substantially similar in language to Family Court Act § 418 (a):

> "The court shall advise the parties of their right to one or more genetic marker tests or DNA tests and, on the court's own motion or the motion of any party, shall order the mother, her child and the alleged father to submit to one or more genetic marker or DNA tests of a type generally acknowledged as reliable by an accreditation body designated by the secretary of the federal department of health and human services and performed by a laboratory approved by such an accreditation body and by the commissioner of health or by a duly qualified physician to aid in the determination of whether the alleged father is or is not the father of the child. *No such test shall be ordered, however, upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel, or the presumption of legitimacy of a child born to a married woman.* The record or report of the results of any such genetic marker or DNA test ordered pursuant to this section or pursuant to section one hundred eleven-k of the social services law shall be received in evidence by the court pursuant to subdivision (e) of rule forty-five hundred eighteen of the civil practice law and rules where no timely objection in writing has been made thereto and that if such timely objections are not made, they shall be deemed waived and shall not be heard by the court. If the record or report of the results of any such genetic marker or DNA test or tests indicate at least a ninety-five percent probability of paternity, the admission of such record or report shall create a rebuttable presumption of paternity, and shall establish, if unrebutted, the paternity of and liability for

the support of a child pursuant to this article and article four of this act" (emphasis added).[1]

The majority posits that once Shondel J. claimed Mark D. was the father and made a showing (visits, support, sworn statements), it was respondent's burden to show equitable estoppel should not be applied since it would not be in the best interests of the child. The facts are not sufficient to support equitable estoppel. While Mark D. financially supported the child and made time to visit her, he has not (in the language of Black's Law Dictionary) "tak[e]n unfair advantage" or been guilty of "false language or conduct"; he has not (in the language of our decision in *Simcuski*) committed any "fraud, misrepresentations or deception." Thus an essential element of equitable estoppel does not exist.

The record is clear that Shondel J. misrepresented the paternity of the child for years and Mark D. relied on this information in good faith. There is no evidence that Mark D. gained any advantage from holding himself out as the child's father. Thus the majority's decision applies estoppel against a completely innocent litigant who gained no benefit from the conduct on which the estoppel is based—a holding without precedent, in the research undertaken here, in this Court's decisions. Mark D. is being required to support this child through payments of $12,858 in arrearage (as of October 2003) and $78 per week, in lieu of providing that support to his own children and his wife.

Moreover, this is a poor case for abandoning the traditional elements of estoppel. The balance of equities is in Mark D.'s favor. Contrary to the majority's view (majority op at 330), there is strong evidence of "fraud or willful misrepresentation" by Shondel J. She not only told Mark D. that the child was his, she swore in Family Court that she had sexual relations with no other man during the relevant time period—testimony proven by DNA tests to be false. Perhaps more important, this is not a case where a child lived for years with, and was brought up by, a man she had always thought was her father (*cf. Matter of Diana E. v Angel M.*, 20 AD3d 370 [2005]). At the time of the paternity proceeding, the child had lived most of her life in a different country from Mark D., and their relationship was primarily on the telephone. This is a case in which this Court

---

1. It is arguable that because DNA and other tests were ordered prior to any decision on equitable estoppel, the said doctrine should not apply here at all.

should remember "the rightful reluctance of courts in a society valuing freedom of association to impose a personal relationship upon an unwilling party," a consideration that applies with special force to "the power of the State to force a parent-child relationship" (*Matter of Baby Boy C.*, 84 NY2d 91, 101, 102 [1994]).

The majority's ruling allows disestablishment of paternity if a presumed father acts promptly but does not allow for an exception for those who have acted in reliance on a misrepresentation or a fraud. The balance of equities should rarely favor continuing such misrepresentation or fraud. To hold as the majority does would reward a presumed father who takes no role in a child's life until a DNA test makes it official or a mother who obtains paternal obligations through fraud. As the Massachusetts Supreme Judicial Court wrote in *A.R. v C.R.*:

> "We would proceed with caution, as other courts have, in imposing a duty of support on a person who has not adopted a child, is not the child's natural parent, but has undertaken voluntarily to support the child and to act as a parent. *In most instances, such conduct should be encouraged as a matter of public policy. The obligation to support a child primarily rests with the natural parents, and one who undertakes that task without any duty to do so generally should not be punished if he or she should abandon it.* On the other hand, a husband who for years acts as a father to a child born to the wife, supports that child, and holds himself out as the father to the child and to the world, may be obliged to continue to support the child when he, for the first time, renounces his apparent paternity in an attempt to avoid court-imposed support obligations. It may be relevant, in deciding whether reliance was detrimental, to know whether there once was an opportunity to pursue the natural father that is now lost" (411 Mass 570, 575, 583 NE2d 840, 843-844 [1992] [citations omitted and emphasis added]).

With this decision, this Court supports a public policy that says a man should never take on a parental role unless he wants to be unconditionally responsible for the child's financial support.

Finally, it is not in the best interests of the child in this matter that the order of filiation and order of support be affirmed.

The Law Guardian concedes that Mark D.'s contributions to this child's life will only be financial. He has had no contact with the child since March 2000. Unlike *Matter of Sharon GG.*, where an estranged husband fought to keep his parental rights, in this matter we have a man fighting to divorce his financial interests from petitioner and her child. While it was in the best interests of the child in *Sharon GG.* to maintain a relationship with an estranged husband who had filled the role of father in every way, it should not be said here that it is in the best interests of a child to have an order of filiation declare respondent to be her father, a man, who in addition to having no biological tie, has no interest in continuing a relationship with her or her mother.[2]

Accordingly, I dissent.

Chief Judge KAYE and Judges CIPARICK, GRAFFEO and READ concur with Judge ROSENBLATT; Judge G.B. SMITH dissents in a separate opinion in which Judge R.S. SMITH concurs.

Order affirmed, without costs.

---

**2.** Respondent argues that his constitutional rights are being violated since he is being deprived of his property in violation of the due process clauses of the federal and state constitutions. We do not address this argument because of the view taken with respect to equitable estoppel.