Matter of Stephen N. v Amanda O. (2019 NY Slip Op 04510)





Matter of Stephen N. v Amanda O.


2019 NY Slip Op 04510


Decided on June 6, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: June 6, 2019

525601

[*1]In the Matter of STEPHEN N., Appellant,
v
AMANDA O., Appellant, and WILLIAM P., Respondent.

Calendar Date: April 25, 2019

Before: Lynch, J.P., Clark, Devine, Aarons and Pritzker, JJ.


Eric R. Gee, Albany, for Stephen N., appellant.
Aaron A. Louridas, Delmar, for Amanda O., appellant.
Adam W. Toraya, Albany, for William P., respondent.
Sharon Lee McNulty, Albany, attorney for the child.



MEMORANDUM AND ORDER
Pritzker, J.
Appeal from an order of the Family Court of Albany County (Kushner, J.), entered August 25, 2017, which dismissed petitioner's application, in a proceeding pursuant to Family Ct Act article 5, to adjudicate petitioner as the father of a child born to respondent Amanda O.
Respondent Amanda O. (hereinafter the mother) gave birth to the subject child in 2003 while she was in a relationship with respondent William P., who signed an acknowledgment of paternity several days after the child's birth. William P. and the mother had a romantic and sexual relationship that began in January 2003 and lasted approximately three years. In February 2003, the mother also had a single sexual encounter with petitioner. William P. has been involved in the child's life since her birth and currently has court-ordered parenting time. In 2006, the mother reached out to petitioner to reconnect because she thought he might be the child's biological father. From June 2006 until October 2008, at which time petitioner was incarcerated,[FN1] petitioner, the mother and the child resided together.
In August 2008, petitioner filed a paternity petition, which was dismissed due to lack of standing (see Family Ct Act § 516-a). In October 2014, petitioner filed another paternity petition alleging, among other things, that he took a private DNA test that determined that he was the biological father of the child. Family Court dismissed the petition on the basis of res judicata, but, on appeal, this Court reversed, finding that, because the 2008 determination was not decided [*2]on the merits, res judicata did not bar the proceeding (140 AD3d 1223, 1224-1225 [2016]). The matter was remitted for further proceedings, at which the attorney for the child stated that the child believed that petitioner was her biological father and joined in petitioner's request for a paternity test. William P. raised equitable estoppel, and Family Court determined that a best interests hearing was required. After a fact-finding hearing and a Lincoln hearing, Family Court determined that petitioner was equitably estopped from asserting paternity in this case and, as such, did not order a DNA test. Family Court also found that "it is in [the child's] best interests to have [William P.] continue to be an active father in her life." The mother and petitioner appeal.
In a paternity proceeding, the trial court may not order a genetic marker or DNA marker test if "it is not in the best interests of the child on the basis of . . . equitable estoppel" (Family Ct Act § 418 [a]). "[T]he doctrine has been used to prevent a biological father from asserting paternity rights when it would be detrimental to the child's interests to disrupt the child's close relationship with another father figure" (Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 6 [2010]; see Matter of Starla D. v Jeremy E., 95 AD3d 1605, 1606 [2012], lv dismissed 19 NY3d 1015 [2012]), and, in this way, "protects the status interests of a child in an already recognized and operative parent-child relationship" (Matter of Felix M. v Leonarda R.C., 118 AD3d 886, 886 [2014] [internal quotation marks and citations omitted]). "[T]he issue does not involve the equities between the two adults; the case turns exclusively on the best interests of the child" (Matter of Shondel J. v Mark D., 7 NY3d 320, 330 [2006]). To that end, if "the record fails to establish that the child would suffer irreparable loss of status, destruction of his [or her] family image, or other harm to his [or her] physical or emotional well-being if this proceeding were permitted to go forward," then equitable estoppel will not apply (Matter of Starla D. v Jeremy E., 95 AD3d at 1607 [internal quotation marks, brackets and citations omitted]; see Matter of Christopher YY. v Jessica ZZ., 159 AD3d 18, 33 [2018], lv denied 31 NY3d 909 [2018]). Thus, the decision to impose estoppel rests upon the trial court's conclusion that maintaining the child's relationship with someone who has assumed the role of a father is more important than the child's need to know the true identity of his or her biological father (see Matter of Greg S. v Keri C., 38 AD3d 905, 906 [2007]), and that such disclosure would harm or traumatize the child (see Purificati v Paricos, 154 AD2d 360, 362 [1989]).
The party asserting equitable estoppel — William P. — must first make a prima facie showing that "he and the child had a parent-child relationship, so as to shift the burden to petitioner to prove that it was nonetheless in the child's best interests to order genetic marker testing" (Matter of Beth R. v. Ronald S., 149 AD3d 1216, 1218 [2017] [internal citations omitted]; see Matter of Patrick A. v Rochelle B., 135 AD3d 1025, 1026 [2016], lv dismissed 27 NY3d 957 [2016]). We find that William P. satisfied his initial burden to support invoking equitable estoppel by presenting evidence that there was a long-term parent-child bond between himself and the child. Specifically, William P. testified that he was present for the mother's doctor appointments throughout the pregnancy, he was present when the child was born and he signed an acknowledgement of paternity shortly after her birth. The record also reveals that William P. began developing a relationship with the child from the time that she was born, as he saw her every day and, despite not living with the mother, spent many nights at the mother's residence helping care for the child. William P. testified that, after he and the mother ended their relationship, he continued to regularly care for the child, including a period of approximately nine months when he had primary physical custody of the child. Other than this nine-month period, William P. had regular, court-ordered parenting time with the child, which was still occurring at the time of the hearing. William P. also testified that he had regularly paid child support. Given this evidence, William P. met his prima facie burden for equitable estoppel by demonstrating that a parent-child relationship existed between the child and himself and, as such, the burden shifted to petitioner to demonstrate that ordering a genetic marker test would be in the child's best interests (see Matter of Christopher YY. v Jessica ZZ., 159 AD3d at 30-33; compare Matter of Patrick A. v Rochelle B., 135 AD3d at 1027-1028).
In the context of a paternity proceeding, a best interests analysis focuses on "factors [such] as the child's interest in knowing the identity of his or her biological father, whether [*3]testing may have a traumatic effect on the child, and whether continued uncertainty may have a negative impact on a parent-child relationship in the absence of testing" (Matter of Mario WW. v Kristin XX., 149 AD3d 1227, 1228 [2017]; see Matter of Beth R. v Ronald S., 149 AD3d at 1218-1219). Petitioner testified that he found out he could be the child's father in 2006, at which time he "never left her side" and "support[ed] her in any way [he could]." Prior to petitioner's incarceration, the child and the mother resided with petitioner for approximately 2½ years. Since being incarcerated, petitioner has written letters to the child, which were delivered by way of third parties because petitioner was not certain if he was allowed to communicate with the child. Petitioner testified that he has sent approximately six or seven cards a year, as well as letters and photographs. In total, petitioner testified that he has sent at least 50 cards and letters since 2008. Petitioner also testified that he has had telephone conversations with the child during which he "tried to parent her the best [he] could over the telephone and explain to her what's right and wrong and . . . basic stuff that a dad would do." Petitioner also testified that the child was involved with his extended family and that he and the mother took a DNA test to determine the child's paternity, which he submitted to Family Court in 2008. Testimony from petitioner's sister corroborated that the child has a relationship with petitioner's family and that the child has been attending family events for over a decade.
The mother's father (hereinafter the grandfather) testified that, during the year prior to the hearing, he gave the child cards and letters from petitioner, which arrived approximately once a week. The grandfather also testified that he mailed letters from the child to petitioner and that he also facilitated telephone calls between the two. The grandfather testified that the child was excited to hear from petitioner. The grandfather conceded that the mother had told him not to allow petitioner to communicate with the child, but that he overruled the mother's decision. He also testified that the child believed that petitioner was her father. Likewise, the mother testified that the child had always called petitioner "dad." She also testified regarding the child's relationship with petitioner's family. The mother testified that the child knows William P. is a "father figure" in her life, but that the child is not confused and has known petitioner to be her father. The mother also testified that she gets along with William P., but explained that this had not always been true because, in the past, he had yelled at her and was physically violent. The mother also testified that the child and William P. do not have a good relationship and that neither he nor the child ever says anything positive about their time together. The mother also testified that the child did not always want to go to visitation with William P.
In light of this evidence, as well as evidence revealed at the Lincoln hearing, we disagree with Family Court's determination that equitable estoppel applies and find that it is in the child's bests interests for DNA testing to occur. The record is clear that the child understands that William P. is her "legal" father and that there is a significant chance that petitioner is her biological father. Although testing could possibly impact the child's relationship with William P., the record reveals that this relationship is already tumultuous and that some of this tumult may stem from the child's uncertainty as to whether petitioner is in fact her biological father. Indeed, it is evident from the record that if the child learns that William P. is her biological father, this information would positively benefit their relationship. The record also reveals that communication between petitioner and the child has occurred, possibly in violation of a court order, but that communication nevertheless occurred and it has had a clear effect on the child that cannot be mitigated by refusing to order a DNA test. In fact, DNA testing can mitigate the turmoil in the child's life that presently exists because she does not know who her biological father is. Although we are certainly mindful of the inherent inequities in allowing a DNA test to occur given the child's age, our analysis must turn exclusively on the best interests of the child (see Matter of Shondel J. v Mark D., 7 NY3d at 330). To that end, we are also mindful that, if petitioner is found to be the child's biological father, given his lengthy incarceration, the child will not be able to enjoy a "traditional" parent-child relationship with him. However, petitioner and the child would be able to communicate by way of letters, telephone contact and potentially through visitation at the prison.
It is clear from the record that the benefit to the child of definitively establishing paternity outweighs any negative impact that an untraditional parent-child relationship may have. [*4]Accordingly, a careful review of the record does not reveal that the child would "suffer irreparable loss of status" or other physical or emotional harm if a DNA test were ordered (Matter of Starla D. v Jeremy E., 95 AD3d at 1607; see Matter of Christopher YY. v Jessica ZZ., 159 AD3d at 33; see also Matter of Emily H. v Gregory O., 58 Misc 3d 971, 975-976 [Fam Ct, Erie County 2017]). Therefore, we find that Family Court's determination to apply equitable estoppel to preclude genetic marker testing was not supported by a sound and substantial basis in the record (see Matter of Christopher YY. v Jessica ZZ., 159 AD3d at 32-33; Matter of Beth R. v Ronald S., 149 AD3d at 1218; Matter of Starla D. v Jeremy E., 95 AD3d at 1607). As such, its order must be reversed and the matter remitted for a DNA test to be administered. In light of this determination, the remaining contentions raised by the mother and petitioner are rendered academic.
Lynch, J.P., Clark, Devine and Aarons, JJ., concur.
ORDERED that the order is reversed, on the law, without costs, and matter remitted to the Family Court of Albany County for further proceedings not inconsistent with this Court's decision.



Footnotes

Footnote 1: Petitioner is currently incarcerated, and the earliest he will be released is 2025.