Matter of John D. v Carrie C. (2022 NY Slip Op 01089)





Matter of John D. v Carrie C.


2022 NY Slip Op 01089


Decided on February 17, 2022


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered:February 17, 2022

533345
[*1]In the Matter of John D., Respondent,
v
Carrie C., Appellant, et al., Respondent.

Calendar Date:January 11, 2022

Before:Garry, P.J., Lynch, Pritzker, Colangelo and Ceresia, JJ.

Theresa M. Suozzi, Saratoga Springs, for appellant.
Matte & Nenninger, PC, Glens Falls (Jeffrey C. Matte of counsel), for respondent.
Anthony Casale, Gloversville, attorney for the child.



Colangelo, J.
Appeal, by permission, from an order of the Family Court of Fulton County (McAuliffe Jr., J.), entered May 4, 2021, which, in a proceeding pursuant to Family Ct Act article 5, ordered genetic marker testing for the purpose of establishing petitioner's paternity of a child born to respondent Carrie C.
Respondent Carrie C. (hereinafter the mother) is the unmarried mother of a child (born in 2014). During her pregnancy, the mother did not know whether petitioner or respondent John E. (hereinafter respondent) was the father because she had intimate relations with both men during the period of conception, and told both men that either could be the father. During the pregnancy, respondent provided financial support and housing to the mother, and accompanied her to prenatal appointments. After the child was born, respondent was listed as the child's father on the child's birth certificate and signed an acknowledgment of paternity. Notably, the mother countersigned the acknowledgement of paternity, certifying that respondent was "the only possible father" of the child. However, respondent submitted to a paternity test when the child was six months old, which disclosed that he was not the child's biological father. He and the mother then agreed that he would no longer be referred to as dad, but rather by his first name. The mother and the child lived with respondent until she and respondent separated in the spring of 2016, a few months before the child's second birthday.
Petitioner, after learning from the mother's coworker that he was the child's father, met with the mother in early January 2020 and thereafter met the child, who had been told by the mother that he was her father. After the meeting, which occurred at a frozen yogurt shop, the child, who had been sitting on his lap and coloring with him, invited him to come back to her house. Regular visitation ensued for more than two months until close to the Easter holiday, when the mother terminated visits and refused to allow contact between petitioner and the child. Petitioner thereafter commenced this paternity proceeding. The mother moved to dismiss the petition alleging the doctrine of equitable estoppel. In November 2020, Family Court determined that a hearing was necessary to determine the issue of equitable estoppel raised by the mother (see Family Ct Act § 532 [a]). At the conclusion of that hearing, Family Court found that the mother met her initial burden of establishing a prima facie case of equitable estoppel but ordered petitioner, the mother and the child to submit to genetic marker tests finding that it was in the child's best interests to do so. By permission of this Court, the mother appeals.
The mother and the attorney for the child contend that a genetic maker test is not in the best interests of the child because such test will cause the child, who is now over seven years old, irreparable harm, particularly as respondent "has held himself out as the child's [f]ather [*2]her whole life." We disagree.
"A court's paramount concern in a paternity proceeding is the child's best interests" (Matter of Schenectady County Dept. of Social Servs. v Joshua BB., 168 AD3d 1244, 1244 [2019] [internal quotation marks and citations omitted]; see Matter of Juanita A. v Kenneth Mark N., 15 NY3d at 5; Matter of Mario WW. v Kristin XX., 173 AD3d 1392, 1393 [2019]). Family Ct Act § 532 (a) provides that, upon "the motion of any party, [the court] shall order the mother, her child and the alleged father to submit to one or more genetic marker or DNA tests . . .. No such test shall be ordered, however, upon a written finding by the court that it is not in the best interests of the child on the basis of res judicata, equitable estoppel, or the presumption of legitimacy of a child born to a married woman" (see Matter of Shondel J. v Mark D., 7 NY3d 320, 329 [2006]). Accordingly, "[i]n a paternity proceeding, the trial court may not order a genetic marker or DNA marker test if 'it is not in the best interests of the child on the basis of . . . equitable estoppel'" (Matter of Stephen N. v Amanda O., 173 AD3d 1280, 1281 [2019], lv dismissed 34 NY3d 1033 [2019], quoting Family Ct Act § 418 [a]). "The purpose of imposing equitable estoppel is 'to protect the status interests of a child in an already recognized and operative parent-child relationship'" (Matter of Montgomery County Dept. of Social Servs. v Jose Y., 173 AD3d 1273, 1275 [2019], lv dismissed 34 NY3d 1010 [2019], quoting Matter of Shondel J. v Mark D., 7 NY3d at 327 [internal quotation marks and citation omitted]). "'[T]he doctrine has been used to prevent a biological father from asserting paternity rights when it would be detrimental to the child's interests to disrupt the child's close relationship with another father figure'" (Matter of Stephen N. v Amanda O., 173 AD3d at 182, quoting Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 6 [2010]). The mother, as the party asserting estoppel here, "must first make a prima facie showing that [respondent] and the child had a parent-child relationship, so as to shift the burden to [petitioner] to prove that it was nonetheless in the child's best interests to order genetic marker testing" (Matter of Montgomery County Dept. of Social Servs v Trini G., 195 AD3d 1069, 1070 [2021] [internal quotation marks and citation omitted]; see Matter of Starla D. v Jeremy E., 95 AD3d 1605, 1606 [2012], lv dismissed 19 NY3d 1015 [2012]). The application of the doctrine of equitable estoppel does not involve the equities between adult participants to the paternity proceedings; "[r]ather, in the context of a paternity proceeding, it is the child's justifiable reliance on a representation of paternity that is considered and, therefore, the doctrine of equitable estoppel will be applied only where its use furthers the best interests of the subject child" (Matter of Starla D. v Jeremy E., 95 AD3d at 1606 [internal quotation marks, brackets and citations [*3]omitted]).
The record reflects that the mother and respondent were intimate between late September or October 2013 through late December 2013, and, towards the end of her pregnancy, she moved into respondent's residence and returned to live there with the child until shortly before the child's second birthday. During that time, respondent provided financial support for the mother and the child and assisted with her daily care and played with her. Respondent was at the hospital for the child's birth and his name is listed on the child's birth certificate. He also signed an acknowledgment of paternity, which the mother countersigned, falsely certifying that respondent was "the only possible" father of the child. The mother testified that the relationship with respondent ended because of their 20-year "age difference" and, consequently, they are "in two different parts of [their] liv[es]" and they "both went different ways." Once they separated, respondent continued to assist financially and is allowed unrestricted access to the child. The mother admitted, however, that respondent is not able to be completely involved as he is "not around a lot during the school year" but, "whenever he is home during the school year, [they] do make arrangements every single time . . . for him to spend time with [the child] [o]r the three of [them together] as a family." The mother testified that the child "loves visiting with [respondent]."
In describing his role when the child was born, respondent testified that he "played [the] role of a father figure." When asked to characterize his current role with the child, respondent stated, "I'm not going to say that I'm playing the role of her father but I'm not going to say that I'm not. As back when we found out that I wasn't the father, we stopped calling me dad[, b]ut I didn't stop playing that role." In 2015, respondent's employment situation changed and, since then, he sees the child when he can and calls her once a week when he is away. He testified that, with regard to financial support, he last rendered assistance to the mother for back rent a month before the hearing and, prior to that, gave her money for car repairs. Respondent provides financial assistance on an as needed basis. Although the mother testified that the child has seen respondent on several occasions since March 2020, cross-examination revealed that the child had only seen respondent three times since November 2020.
Although respondent has had a long-standing relationship with the child since birth, it does not equate to an operative parent-child relationship, particularly after the child moved out of his residence in the spring of 2016. The child knows that respondent is not her father and does not refer to respondent as dad. She has been told that petitioner is her father and calls him daddy. Moreover, respondent was unable to testify to any fatherly activities that he engages in with respect to the child's care or well-being[*4], and only testified to the extent that he plays with her, colors with her and watches cartoons with her. Significantly, aside from being listed on the child's birth certificate, the record is bereft of evidence that respondent has been held out to the public as the child's father. To the contrary, the mother conveyed to her coworker that petitioner is the child's father. We agree with Family Court's assessment that respondent transitioned from a fatherly role to a friendly role upon discovering that he was not the child's biological father, and the child, who was six years old at the hearing, has been raised with the understanding that respondent is not her father. Unfortunately, the mother testified that she now indicates to the child that respondent is her father, knowing with certainty that he is not.
Accordingly, as "the record fails to establish that the child would suffer irreparable loss of status, destruction of [her] family image, or other harm to [her] physical or emotional well-being if this proceeding were permitted to go forward," we find, contrary to Family Court's order, that the mother failed to meet her burden and equitable estoppel does not apply (Matter of Stephen N. v Amanda O., 173 AD3d at 1281 [internal quotation marks, brackets and citations omitted]).[FN1]
By contrast, a parent-child relationship between petitioner and the child has evolved since their initial contact in early January 2020. Once petitioner learned that he was the child's father and the mother introduced him to the child as her father, petitioner maintained regular visitation with the child. He visited with the child every Saturday and Sunday and arranged his work schedule to be off on Fridays as well, so that he could spend another day with the child. Beginning the third weekend of visitation and for an entire week in February 2020, he stayed at the mother's house caring for and playing with the child. The child was in elementary school and he and the mother took the child to school. On one occasion, he picked her up from school, after the mother gave the school written permission for him to do so. During their period of visitation, petitioner and the child attended a father-daughter dance at the child's school. The child gave petitioner a Valentine's Day card in which she referred to him as "daddy" and gave him other cards and art projects which stated, "I love you to pieces" and "daddy."
The mother testified that she stopped allowing the child to see petitioner after petitioner became "demanding" about having regular weekend parenting time with the child at his home and outside of the mother's presence. Petitioner claims that, although a sexual relationship with the mother was renewed as weekend visits began, it ended because he was not ready to discuss being a family and was more focused on the child. He testified that when he tried to contact the mother to see the child, the mother told him that "no one over here misses you." Petitioner was [*5]refused all future visitation and told that he could no longer contact the child. Interestingly, this appears to coincide with petitioner's refusal to provide financial assistance without proof of paternity and around the time that petitioner ended his intimate involvement with the mother. We also note that, at the time of hearing, the mother and the child had been living with another man whom the child refers to by his first name. She does not call this man daddy or refer to him as her father. Accordingly, as equitable estoppel does not bar issuance of an order for genetic marker tests, we affirm.
Garry, P.J., Lynch, Pritzker and Ceresia, JJ., concur.
ORDERED that the order is affirmed, without costs.



Footnotes

Footnote 1: In finding that the mother met her initial burden of proving equitable estoppel, Family Court may have placed undue reliance on the appearance of respondent's name on the birth certificate, his acknowledgment of paternity, his presence at the hospital when the child was born and his significant participation in the care of the child for the first year and a half of her life.