EDELINE AUGUSTIN, Appellant, v NERVA AUGUSTIN, Respondent. [913 NYS2d 207]—

Order, Supreme Court, New York County (Laura E. Drager, J.), entered on or about April 13, 2009, which, to the extent appealed from, as limited by the briefs, denied plaintiff's motion to vacate a judgment of divorce entered by the Clerk of that court in 1985 and for an award of counsel and expert fees, modified, on the law and the facts, to remand the matter for an evidentiary hearing with respect to so much of plaintiff's motion as seeks an order vacating the 1985 judgment of divorce, and otherwise affirmed, without costs.

The IAS court denied plaintiff wife's motion to vacate the 1985 divorce judgment on the ground of fraud. A motion to vacate a judgment upon the ground of fraud pursuant to CPLR 5015 (a) (3) must be made within a reasonable time (*see Weimer v Weimer*, 281 AD2d 989 [2001] [four-year delay unreasonable]; *Richardson v Richardson*, 309 AD2d 795 [2003] [12-year delay unreasonable]; *Sieger v Sieger*, 51 AD3d 1004, 1006 [2008], *lv denied* 14 NY3d 711 [2010] [seven-year delay unreasonable]). The IAS court found that the wife was aware of the defendant husband's alleged misconduct by July 1990, and that she waited until 2008 to move to vacate the judgment. It determined that the wife's 18-year delay was unreasonable.

Although the wife never argued below that the 1985 judgment should be vacated for lack of jurisdiction pursuant to CPLR 5015 (a) (4), contrary to the husband's contention, this Court may review the argument since it is a legal argument which appears upon the face of the record and could not have been avoided if brought to the husband's attention at the proper juncture (*see Chateau D' If Corp. v City of New York*, 219 AD2d 205, 209 [1996], *lv denied* 88 NY2d 811 [1996]). The wife's argument, however, lacks merit. Although a motion to vacate a judgment for lack of jurisdiction may be made "at any time" (*Caba v Rai*, 63 AD3d 578, 580 [2009]), such a motion should be denied if the movant acted as if the judgment were in effect before moving to vacate it (*Calderock Joint Ventures, L.P. v Mitiku*, 45 AD3d 452, 453 [2007]). Here, the IAS court determined that because the wife did not deny that she submitted the 1985 divorce judgment to the Queens County Family Court in 1992 to obtain support for herself and her children, she waived any objection to the court's jurisdiction over her (*see id.*).

Given that the wife failed to submit a complete copy of her statement of net worth and her motion to vacate lacked merit, the IAS court providently exercised its discretion in denying the wife's motion for counsel fees (*see* Domestic Relations Law § 237 [a]; *see generally DeCabrera v Cabrera-Rosete*, 70 NY2d 879, 881 [1987]).

The IAS court also providently exercised its discretion in denying the wife's motion for expert fees, namely $1,000 for a handwriting expert's appearance at trial. Because the wife's motion to vacate the 1985 divorce judgment was denied, the handwriting expert's appearance was not necessary.

However, inasmuch as each party contends that the other surreptitiously procured the 1985 judgment by some form of deceit, and given the policy implications of a fraud being perpetrated on the court, we exercise our independent discre-

tion and remand for an evidentiary hearing. If it is found that it was the wife who wrongfully obtained the divorce, her motion to vacate the judgment should be denied. If, however, it was the husband who was fraudulent, then Supreme Court can reach the issue of whether the wife's delay in seeking to vacate the judgment was reasonable, or whether she waived any challenges to the validity of the judgment by relying on it in seeking maintenance and support in Family Court in 1992.

We do not find it necessary at this juncture to draw inferences from an incomplete and contradictory record, particularly in light of our remand for a hearing. Indeed, the need for an evidentiary hearing is manifest by the IAS court's characterization of the wife's lack of "credibility and bona fides" and the concurrence's assertion that "there is a substantial basis for believing that the *husband* fraudulently obtained the divorce" (emphasis added). Concur—Acosta, Freedman and Román, JJ.

Nardelli, J.P., and McGuire, J., concur in a separate memorandum by McGuire, J., as follows: I write separately because the majority's discussion of the only significant issue in this remarkable case is inadequate and flawed.

A judgment of divorce in an action ostensibly commenced by the wife was entered in Supreme Court, New York County, on July 1, 1985. Although no definitive conclusion can or should be reached on this record, there is a substantial basis for believing that the husband fraudulently obtained the divorce without the wife's knowledge pursuant to a scheme he devised and executed. Indeed, Supreme Court acknowledged that when it wrote of the "apparent improprieties engaged in by the [husband] to obtain the 1985 divorce judgment." Nonetheless, Supreme Court denied the wife's September 2008 motion seeking, inter alia, to vacate the 1985 judgment. Supreme Court held that the wife could not challenge the 1985 judgment because she concededly knew of it by mid-1990 at the latest and did not take affirmative steps to challenge it in the ensuing 18 years. According to Supreme Court, the "apparent improprieties" of the husband "do not excuse the [wife's] 18-year inaction." It is not clear whether Supreme Court's ruling was based on waiver or estoppel. In any event, Supreme Court effectively precluded the wife from seeking maintenance, equitable distribution of marital assets and all other benefits a spouse otherwise is entitled to seek on the dissolution of a marriage.

Supreme Court should have held a hearing with respect to so much of the wife's motion as seeks an order vacating the 1985 divorce judgment. Both parties to this action have submitted sworn affidavits to the effect that each did not know anything

about the 1985 action before the judgment was entered. Certainly one of them is lying about that (possibly, but implausibly, both are lying). In the procedural posture of this case, we should assume that the husband fraudulently obtained the judgment. As discussed below, only the mere inaction of the wife supports Supreme Court's ruling. The wife's inaction cannot justify a ruling by Supreme Court that effectively validates the fraudulent judgment, penalizes the wife, perhaps substantially, and not only disregards the apparent wrongdoing of the husband but permits him to profit, perhaps substantially, from that wrongdoing.

The parties were married in Haiti in January of 1973 and have three adult children from the marriage. In 1983 a decree of divorce was issued in Haiti in an action commenced by the husband. Although the parties dispute the validity of that decree, obtained on the wife's default, Supreme Court did not rule on the issue and we need not and should not address it.

In January of 1985, a divorce action was commenced in Supreme County, New York County, purportedly by the wife, represented by Jean H. Charles, Esq. The complaint, ostensibly verified by the wife, alleges, inter alia, abandonment by the husband and that the parties had been living separate and apart for more than two years. An affidavit purportedly executed by the wife that same month also so asserts, and alleges as well that the husband had admitted service of the summons with notice, was not seeking equitable distribution and was waiving his right to answer and to service of any additional papers. Mr. Charles notarized both sworn statements. In an affidavit sworn to on January 12, 1985, the husband (or an imposter) admitted service of the summons with notice, stated he was not seeking equitable distribution and was waiving his right to answer and to service of any additional papers other than the judgment of divorce. By an "Affirmation of Regularity," dated April 29, 1985, Mr. Charles requested that the action be placed on the undefended calendar for trial. The judgment of divorce, entered on July 1, 1985 on motion of Mr. Charles, awarded custody of the children to the wife, with Family Court exercising concurrent jurisdiction over issues of child custody and child support. Neither the complaint, the affidavit ostensibly submitted by the wife nor the judgment of divorce makes any mention of a request by her for maintenance or child support.

Almost 23 years later, in April 2008, the wife commenced a divorce action in Supreme Court, Queens County. In her amended verified complaint, the wife swore that the husband had abandoned her in 2002 by leaving the marital residence and

promising never to return. She swore as well that she had supported the husband through medical school and that shortly after he graduated from medical school the husband had left the marital home, periodically returning only to finally leave in 2002. In addition, she asserted that there was no judgment of divorce in favor of either party and against the other in any court of competent jurisdiction. The wife sought, inter alia, an "evaluation of [the husband's] medical license and practice," equitable distribution of marital assets and exclusive occupancy of the marital residence.

In his answer, the husband set forth the 1985 divorce judgment as an affirmative defense and counterclaimed for sanctions, alleging that the action was frivolous because of the 1985 judgment the wife allegedly obtained. Thereafter, in early September 2008, the husband moved to dismiss the complaint pursuant to CPLR 3211 (a) on the basis of the 1985 judgment.

Later that month, the wife brought the motion that is at issue on this appeal in Supreme Court, New York County. She seeks an order: vacating the 1985 judgment, staying the Queens action and granting her pendente lite counsel and expert fees. In an affidavit submitted in support of the motion (the main affidavit) the wife asserted that after their marriage in Haiti in 1973, she supported the husband while he was attending college and medical school there. According to the wife, she "originally came" to the United States in 1969 and, through her sponsorship, defendant came to the United States in 1977 and obtained permanent residence. The husband assertedly left the marital home several times during the course of the marriage. During 1981 and 1982, after having left the marital home in 1980, he visited the two children they had at the time. After one visit, they became intimate for a brief period, which resulted in the birth of their third child in January 1982. The wife also maintained that in 1997 the husband decided to return to the marital home and she "foolishly agreed to take him back." The couple lived with their children in an apartment in Queens, with the wife providing the sole support for the family (except for a brief period in which the husband worked) until late in 2002. Late that year, the husband left the marital home for the last time, after obtaining work at a hospital in Brooklyn. Also according to the wife, the husband "passed his medical boards" in 2004 and moved to North Carolina where he was employed as a physician.

With respect to the 1985 divorce, the wife swore that she had never filed for a divorce prior to the action she had commenced in Queens, that she had not retained and did not know an at-

torney by the name of Jean H. Charles and that the purported signature of hers on the "Affidavit of the Plaintiff" in the 1985 divorce action was a forgery. According to the affidavit of a handwriting expert who analyzed the signatures on the two affidavits purportedly submitted by the wife in the 1985 action, the person who signed those affidavits was not the same person who had produced known signatures of the wife. Her attorney affirmed that there was no current listing for an attorney named Jean H. Charles but that an attorney with that name had been suspended by the Second Department since 1995 (see *Matter of Charles*, 206 AD2d 139 [1994]).

Counsel also argued that "the fact that [the husband's] signature appears with the fraudulent papers utilized in obtaining the divorce is virtual proof that he was a party to the fraud." In addition, pointing to the absence of any provision in the 1985 judgment for equitable distribution, maintenance or child support, counsel contended that the husband was the only person who could benefit from the fraudulent divorce.

In opposition to the motion, the husband swore that he had obtained a divorce from the wife in Haiti in 1983, that as far as he knew the Haitian divorce was valid and that he had given the wife a copy of the decree in late 1983. He denied having played any role, let alone a fraudulent one, in the 1985 divorce action. He swore not only that he did not appear in that action but that he "did not even know about it." With respect to the affidavit submitted to the court in the 1985 action purportedly sworn to by him, the husband denied the signature was his and asserted that he had never authorized anyone to sign his name to it. According to the husband, he recalled that "on or before 1992," the wife appeared in Family Court in Queens County and told the judge that she had obtained a divorce. He also swore that the wife then "handed a piece of paper to the court, the contents of which [he] was unaware." He claimed he recently had told his attorney of this recollection and, referring the court to his attorney's affirmation, contended that "[i]t now appears that the piece of paper was a copy of the [1985 judgment]." In his attorney's affirmation, counsel stated that while examining the contents of the Queens County Family Court file, the record room clerk with him at the time found a copy of the 1985 judgment. Apparently, that copy, a copy of which was attached to the affirmation, was not in the folder it should have been in; it was certified on July 3, 1985, two days after its issuance.

The plot soon thickened with a new twist. In a reply affidavit (erroneously denominated a "sur-reply" affidavit), the wife

stated that she "kn[e]w the [husband] committed fraud" in procuring the 1985 judgment because of a letter dated July 27, 1990 she had received from the Departmental Disciplinary Committee (DDC), First Department. The letter, a copy of which was attached to her affidavit, is addressed to the wife and reads as follows:

"The Departmental Disciplinary Committee has completed its investigation of Jean H. Charles, Esq., in connection with your complaint.

"The Committee found that, early in 1985, Nerva Augustin, your husband, consulted Mr. Charles with regard to obtaining an uncontested divorce. Based on information Mr. Charles received from your husband, he prepared the necessary papers and advised Mr. Augustin to return to his office with you to sign them. On or about January 15, 1985, Mr. Augustin appeared at Mr. Charles' office with a woman he represented to be his wife and documents were signed and thereafter filed in New York County. On July 1, 1985, a divorce judgment was signed by Honorable Benjamin F. Nolan. In February 1987, Mr. Charles was contacted by David H. Brown, Esq., your attorney, who advised Mr. Charles that you had just learned of the divorce but had never consented to or participated in this proceeding. Mr. Charles thereafter contacted your husband who acknowledged that the woman who had appeared with him in Mr. Charles' office in 1985 had not been you. Although Mr. Charles contacted Mr. Brown and indicated a willingness to take whatever legal steps were necessary to void the divorce, he has not yet taken such steps.

"This is conduct contrary to the spirit of the Code of Professional Responsibility, and the Committee issued a Letter of Caution to Mr. Charles."

Although it is hard not to conclude that the wife made no mention of the DDC letter in her main affidavit because she hoped thereby to give the husband the rope with which to hang himself, she "apologize[d] to the Court for not providing the document with [her main] affidavit." As noted above, she asserted that "[a]fter receiving this letter . . . , [she] was under the impression that the divorce was invalid and [she] was still married to the [husband]." She made no specific reference to the husband's assertions concerning either the 1983 Haitian divorce decree or to the statements she allegedly made to the Family Court judge regarding a divorce she had obtained. However, she stated that she had "read the reply affidavit of [her husband], and den[ied] all of the allegations therein."

Unquestionably, unless it also is a forgery, the DDC letter

provides considerable support for the wife's position that the husband fraudulently procured the 1985 judgment and perjuriously denied any knowledge of the judgment before it was issued in the affidavit he submitted on this motion. Nonetheless, as noted above, Supreme Court denied the wife's motion to vacate the 1985 judgment on the ground that she could not challenge it because she had not taken any legal action to invalidate it for some 18 years after receiving the DDC letter. Supreme Court summarily rejected the wife's assertion that she had been under the impression after receiving the DDC letter that the divorce was invalid. Because of the statement in the letter that although Mr. Charles had "indicated a willingness to take whatever legal steps were necessary to void the divorce, he has not yet taken such steps," Supreme Court found this "self-serving claim" of the wife to be "not credible."

In the first place, Supreme Court should not have summarily rejected as "not credible" the wife's assertion that she was under the impression the divorce was invalid. Perhaps only a lawyer could think that the law would regard as valid a divorce judgment obtained through the fraudulent and criminal conduct of one spouse without the knowledge of the other. Lacking the advantages of training in the learned ways of the law, however, the wife reasonably could have had the common sense belief that the judgment was not worth the paper it was written on. The statement in the DDC letter that Supreme Court relied on certainly was not sufficient by itself to require the wife to believe the opposite. More importantly, as discussed below, what the wife believed about the legal status of the judgment after learning of its existence is irrelevant.

In her motion, the wife alleged that the 1985 judgment "present[ed] a case of 'extrinsic fraud,' i.e., 'a fraud practiced in obtaining a judgment such that a party may have been prevented from fully and fairly litigating the matter' " (*Aguirre v Aguirre*, 245 AD2d 5, 7 [1997], quoting *Shaw v Shaw*, 97 AD2d 403, 403 [1983]; *see generally United States v Throckmorton*, 98 US 61 [1878]). Because it is right on point, I quote at length from the Second Department's discussion of extrinsic fraud, also referred to as fraud on the court, in another matrimonial action: "A judgment obtained without proper service of process is invalid, even when the defendant has actual notice of the lawsuit, because as a prophylactic measure such a rule is necessary to prevent 'sewer service' (see *Feinstein v Bergner*, 48 NY2d 234, 239-241). 'Sewer service' is, however, but one species of fraud that the Legislature and courts are concerned with vis-à-vis invalid default judgments. Extrinsic fraud, which includes the

touting of someone away from the courthouse, to prevent any possibility of an adverse result, is another (Siegel, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR 5015, p 365, 1964-1982 Supp Pamph). In fact, from a policy point of view, there is little if any difference between a default judgment obtained by 'sewer service' and one obtained where the defendant might be properly served, but then, through some device, trick, or deceit, is led to believe that he or she need not defend the suit. Both are frauds on the court and on the defendant (see *Matter of Holden*, 271 NY 212, 218). It is not surprising, therefore, that a judgment obtained through extrinsic fraud, like one obtained without proper service, is considered a nullity (*Tamimi v Tamimi*, 38 AD2d 197 . . . )'' (*Shaw v Shaw*, 97 AD2d 403, 404 [1983]).

That the 1985 judgment is, or at least was, a nullity is supported as well by the venerable holding of *Riggs v Palmer* (115 NY 506 [1889]) that a person may not profit from his own wrongdoing. Moreover, what the Court of Appeals has said about foreign judgments surely is true of judgments issued by New York State courts: "foreign judgments generally should be upheld unless enforcement would result in the recognition of a transaction which is inherently vicious, wicked or immoral, and shocking to the prevailing moral sense" (*Greschler v Greschler*, 51 NY2d 368, 377 [1980] [internal quotation marks and emphasis omitted]).

Assuming the truth of the wife's factual allegations, the husband committed a fraud on the court and the 1985 judgment is, or at least was, a nullity. Given the invalidity of the judgment when it was issued, any belief by the wife that it nonetheless was valid must be irrelevant. Any such belief could not have the alchemistic effect of transforming that nullity into a valid judgment. Notably, Supreme Court cited no authority for the proposition that the onus is on the party victimized by a fraud on the court to undertake and bear the cost of a legal challenge to the fraudulently obtained judgment. If a divorce judgment is fraudulently obtained and the spouse committing the fraud is living with the defrauded spouse and their children, it is particularly indefensible to rule that after learning of the fraud the defrauded spouse, on pain of validating the judgment by inaction, must bring a legal action to challenge it.

It may be that a judgment obtained by the commission of a fraud on the court can be transformed by waiver or estoppel into a judgment that is valid in the sense that it binds the innocent party (*see Shaw v Shaw*, 97 AD2d at 404). But no estoppel or fraud can be found on this record as "there is no evidence

that [the husband] has been prejudiced by virtue of [the wife's] conduct subsequent to h[er] learning of the divorce judgment" (*id.*). In his sworn affidavit, the husband makes no assertion that the wife made any statement or did anything about the 1985 judgment that he relied on to his detriment. To be sure, the husband swore that he had recently told his counsel that he recalled the wife telling a Family Court judge "on or before 1992 . . . that she had obtained a divorce, and at that time she handed a piece of paper to the court." Even assuming that she made this statement, the defendant does not assert that he relied on it to his detriment in any way.

In its decision and order, Supreme Court wrote that "[t]he [husband] avers, with documentary evidence, and the [wife] does not deny that a copy of the 1985 divorce judgment was submitted to the court in a 1992 Queens County Family Court proceeding brought by the [wife] for child support." Supreme Court may have intended this sole reference to the husband's claim to be construed as a finding that the wife in fact submitted the 1985 judgment to the Family Court. For several reasons, however, it would not matter if that is what Supreme Court intended. First, to repeat, the husband did not make the essential assertion that he was prejudiced (*Matter of Shondel J. v Mark D.*, 7 NY3d 320, 326 [2006] ["(t)he purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted"]). Second, Supreme Court is plainly wrong in stating that the wife did not deny the husband's assertion. Indeed, at the outset of its decision and order, Supreme Court correctly noted that the wife "generally denies all the allegations made in the [husband's] responding papers." Even putting aside that there is a substantial basis to conclude that the husband had committed a fraud on the court, absent an admission by the wife Supreme Court should not have accepted the truth of the husband's version of the facts. Nor does the wife's denial strain credulity. To the contrary, particularly given the factual basis for concluding that the husband fraudulently orchestrated the 1985 divorce, the husband's assertion smacks of a *deus ex machina*. It may be that the 1985 judgment was put into the Family Court file by one of the parties rather than a court employee, but nothing other than the husband's say so supports the conclusion that the wife rather than the husband was the guilty party. Moreover, as the wife points out on appeal, the copy of the 1985 judgment in the Family Court file was certified two days after its issuance. If the husband fraudulently orchestrated the 1985

judgment, it is reasonable to infer that he obtained the certified copy two days after the judgment's issuance. And if that is so, it also may be reasonable—I would not, of course, decide the point—to infer that he eventually placed it in the Family Court file in an attempt to pin the blame on the wife.

Third, even if the wife did tell Family Court about the 1985 judgment and defendant thereby was prejudiced (I doubt, however, that the requisite prejudice could be supplied by child support payments he may have been required to make), it does not follow that the wife would be estopped from asserting her right to challenge the validity of the judgment. As the Court of Appeals has stated: "The law imposes the doctrine [of equitable estoppel] as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position" (*Matter of Shondel J.*, 7 NY3d at 326). Although I need not decide the point, suffice it to say that if the husband fraudulently orchestrated the 1985 judgment, it is far from clear that he could make any coherent claim of entitlement to the doctrine on fairness grounds (*cf. Riggs v Palmer, supra*).

Nor can waiver be found on this record. Again, *Shaw v Shaw* is right on point: "A judgment which might otherwise be subject to vacatur may, in certain circumstances, not be disturbed if the proponent of such a measure has, by work or deed, waived his right to relief. Waiver, being a matter of intent, is generally an issue of fact to be established at a hearing or trial. Whether defendant has waived any complaint he may have on the ground of extrinsic fraud is not, on this record, something which can be resolved as a matter of law" (97 AD2d at 404-405 [citations omitted]).

Supreme Court also erred in concluding that the wife's "credibility and bona fides are further cast in doubt" because her verified pleadings in the Queens County matrimonial action she commenced in April 2008 "falsely recit[ed] that 'there is no judgment of divorce in favor of either party and against the other' without any reference to the 1985 judgment." This conclusion depends completely and fatally on the validity of Supreme Court's antecedent conclusion that the wife did not believe the 1985 judgment to be invalid. Moreover, the conclusion wrongly excludes the possibility that the wife's attorney was responsible for making no mention of the 1985 judgment in the belief that it was invalid. In any event, even if she did not believe the 1985 judgment was invalid, neither estoppel nor

waiver can be found on the basis of the nondisclosure of the 1985 judgment.

Before addressing the majority, a final point should be made: the commission of a fraud on the court is more than a serious wrong to the defrauded party in the litigation. Obviously, because the court, too, is defrauded, it is a public wrong as well. As it is in the public interest to determine who committed this fraud on the court, an evidentiary hearing should have been ordered for this additional reason.

Because the commission of the particular fraud on the court alleged by the wife necessarily entails the conclusion that Supreme Court lacked jurisdiction to issue the 1985 judgment, I think it irrelevant that the wife's motion did not expressly challenge the judgment on that ground. After correctly concluding that a challenge on jurisdictional grounds is properly before it, the majority incorrectly disposes of it. Even if the holding of *Calderock Joint Ventures, L.P. v Mitiku*, 45 AD3d 452 [2007]) were as broad as the majority reads it to be, the majority errs in concluding that the wife "waived any objection to the court's jurisdiction over her." The factual predicate for the waiver appears to be that "the IAS court determined that . . . the wife did not deny that she submitted the 1985 divorce judgment to the Queens County Family Court in 1992 to obtain support for herself and her children." As discussed above, however, the wife did deny this assertion by denying *all* the allegations in the husband's affidavit in response. The most that can be said is that the wife did not specify that this particular allegation of the husband was included within the allegations she denied. The majority does not dispute this point or argue that the wife had some obligation to single out this particular allegation. Moreover, if the wife waived any objection on jurisdictional grounds, the majority should explain why its waiver analysis does not apply to her objection that the husband obtained the judgment by committing a fraud on the court.

The majority states that "[i]f . . . it was the husband who was fraudulent, then Supreme Court can reach the issue of whether the wife's delay in seeking to vacate the judgment was reasonable." This statement is unfortunate because it implies—and the majority does not disavow the implication—that mere inaction by the wife may be sufficient to warrant denying her motion. I agree with the majority that it is not "necessary at this juncture to draw inferences" about which party did what. But more importantly, it is not appropriate to draw any such inferences on this record. The need for an evidentiary hearing is manifest, but not for the reasons given by the majority. A hear-

ing is necessary because who is telling the truth about material issues of fact cannot be determined from the papers and the rights of the parties may turn on who is telling the truth.