R.R. v J.T.D. (2023 NY Slip Op 51480(U))

[*1]

R.R. v J.T.D.

2023 NY Slip Op 51480(U)

Decided on July 27, 2023

Family Court, Kings County

Waksberg, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 27, 2023
Family Court, Kings County

R.R., Petitioner,

against
J.T.D., Respondent.

Docket No. V-xxxxxx

Petitioner — Devian Daniels, Esq. 
Respondent — Elliot Green, Esq.
Attorney for the Child — David Polsky, Esq. (Children's Law Center)

Judith Waksberg, J.

Background
On or about June 14, 2019, the Petitioner-Father ("Petitioner") filed a petition in Family Court seeking visitation with his two children, A. and S. At the time he filed, he informed the jurist presiding over the case that he did not know where the Respondent-Mother ("Respondent") lived. Two months later, the Petitioner's court-appointed attorney requested an order for a private investigator to find the Respondent. This request was granted and the Respondent was [*2]served about three months after the Petitioner's initial appearance in Court. After the Respondent was served and did not appear, a stayed warrant was issued. Again, the Respondent did not appear and this time, a warrant for her arrest was issued. In February of 2020, the warrant was executed and the Respondent appeared in court with her attorney. Her attorney asserted that there was an issue of equitable estoppel to be raised against the Petitioner's visitation petition and the matter was set down for a hearing on the issue of equitable estoppel.
Unfortunately, the Covid pandemic intervened, and the hearing did not commence until October of 2021.[FN1]
By that time, the petition for visitation with A. had to be dismissed as he was over the age of 18. The Attorney for the Child S. informed the Court that he was also asking for a hearing on equitable estoppel as S. had no knowledge of the Petitioner and there was another man whom she identified as her father.[FN2]

Equitable Estoppel Hearing
The Respondent's Evidence
The Respondent, J. T. D., testified that she had three children: A. T., born in 2002; S. R. T., born in 2009; and A. D., born in 2012. The Respondent married R. D. in August 2012. R. R., the Petitioner, is the biological father of her older son and of S.
The Respondent testified that the last time the Petitioner saw S. was in May 2012. At that time, S. was about two years and four months old. Since then, the Petitioner has not sent any gifts or cards or provided any financial support for the child. The Respondent testified that S. calls the Respondent's husband "Daddy" and that S. has never asked about her biological father. The Respondent testified that her husband attends all the school events for the child, including parent-teacher conferences. He knows the child's teachers and her doctor and he helps the child with her schoolwork. She also said that the child has a relationship with her husband's extended family. 
The Respondent testified that no one from the Petitioner's family had reached out to her to have contact with the child. She said she was not aware of any efforts by the Petitioner to contact the child and said she never prevented the Petitioner from contacting the child. She said that, aside from getting married, she had not changed her name and she did not change her daughter's name. She said she had not tried to hide her location and that she was not aware of any attempts by the Petitioner to contact the child or to inquire about her well-being. 
The Respondent testified that on her school papers, S.'s last name is R. T., but on her [*3]report card, it is listed as R. T. (with the R. just as an initial). When she registered her for school, the Respondent used the same name that was on the child's birth certificate.[FN3]
The Respondent testified that the child is aware that R. T. is her last name; however, the Respondent stated that there have been no conversations with the child as to why her last name is different from everyone else in her household. The Respondent's husband, R. D., never legally adopted the child.
The Respondent recounted that she was living in the Dominican Republic in her father's house when the child was born. The Petitioner had full access to the child while she was living there. He would come to the maternal grandfather's home and would feed the child and change her diaper and put her to sleep. When the child was about eight months old, the Respondent left the child in the care of the Petitioner's sister. The Respondent was ill with a heart condition and had to leave the country. She asked the paternal aunt to care for the child, but instead, the Petitioner took the child and cared for her. The Petitioner was not fully employed at that time and he took care of the child full-time. The Respondent stayed in touch by telephone.
The Respondent was gone from the Dominican Republic for about four months; she returned a week before the child's first birthday. The Respondent stayed in the Dominican Republic for another four months and then returned to New York. She could not bring the child with her as she did not have the appropriate documents to do so. She left the child in the Petitioner's care when she returned to New York the second time. She said that the child was living in the paternal grandmother's home and claimed that the Petitioner himself did not live there, although he spent time there.
The Respondent returned to the Dominican Republic about eight months later, when the child was about two years old. The Respondent and Petitioner stayed in touch while she was away. The Respondent filed for a fiancé visa for the Petitioner to come to the United States. The Respondent testified that she told the Petitioner she was taking the child to the United States. The last time the child lived in the Dominican Republic was when she was two years, four months old. The Respondent said the child's leg was broken when she took her to the United States, and she felt that she had not been properly cared for.
The Respondent testified that she came to New York with the child on February 11, 2012, and the Petitioner reached out to her on that day. Then, she did not hear from him until he arrived in New York approximately a month later, in March 2012. When the Petitioner arrived in New York, the Respondent allowed him access to the child. The Respondent and the Petitioner ended their engagement, however, soon after the Petitioner arrived in New York. Under the fiancé visa the Petitioner had received, he was only able to remain in New York for 90 days, as they did not get married. The Respondent testified that after those ninety days, the Petitioner "disappeared." She stated that she married her current husband in August 2012. 
The Respondent testified that after the Petitioner went back to the Dominican Republic, he called her multiple times and she allowed him to speak to the children. However, she said that [*4]when S. was four years old, she was diagnosed with a learning disability. When the child was in Head Start, the Respondent was told she needed to pay for an aide to be with the child. At the time of the Respondent's testimony, the child had an Individualized Education Program ("IEP") and had an aide with her all the time. The Respondent said she asked the Petitioner for help in paying for services for S., but the Petitioner refused to help and said that he wanted "nothing to do" with the child. The Respondent testified that after that, she lost all contact with the Petitioner. She also said the Petitioner changed his phone number.
The Respondent testified that the Petitioner has never reached out to her about the child, nor has anyone from the Petitioner's family reached out to the Respondent about the child from 2012 to 2019. The Respondent said that she herself reached out to the paternal grandparents about twice a year. S. did not speak with her paternal grandparents as she does not speak Spanish; however, the Respondent tells S. that she is speaking with her grandparents and she translates for them. The child does not know whether these grandparents are paternal or maternal.
The Respondent testified that she has never discussed the Petitioner with the child. The child only knows the Respondent's husband as her father. 
The Respondent said that she had no contact with the Petitioner from 2012 to 2019. In 2019, she contacted the Petitioner in order to obtain a passport for the child. She was able to contact him through her uncle who obtained the Petitioner's phone number. The Petitioner agreed to sign for the passport, but she said he then disappeared again.
The Petitioner's Evidence
The paternal grandmother, A. C. V. testified that she met S. when she was born, but that she had not seen her since the child was about two years old. Ms. C. V. was 84 years old at the time of her testimony and she was living in the Dominican Republic. She testified that she helped to raise the child from birth to the age of two as the Respondent had left the child with her and with the Petitioner who was living with her. 
Ms. C. V. said that since the child left the Dominican Republic, she has spoken with her four times. She also spoke with the Respondent but said the Respondent never informed her of any plans for the child.
At some point, when the Petitioner was caring for the child in the Dominican Republic, the Petitioner moved out of the paternal grandmother's home to a small house with the child. Ms. C. V. testified that the Petitioner was a good parent.
The child's paternal aunt, I. D. R. de P. testified that she has known the Respondent for many years. She testified that when the child was born, the child lived together with the Respondent and Petitioner until the Respondent left, and the child remained in the Petitioner's care. Ms. R. de P. testified that the Respondent did not leave the child with her; she left the child with the Petitioner. Ms. R. de P. stated that the Petitioner took good care of the child. She said that she helped the Petitioner take care of the child and that she did not have any concerns about the Petitioner's care.
The Respondent took the child out of the country when the child was two and one-half years old and that was the last time Ms. R. de P. saw the child. She said that the child had a problem with one of her legs but she did not have broken bones. 
Another paternal aunt, R. R., testified that in 2012, she was living in Brooklyn. She said [*5]the Respondent and child lived with her for three months when the child was two and one-half years old. Ms. R. testified that the child had fractured a bone when she was in the Dominican Republic, but when the child came to Ms. R.'s home, the child was already walking normally. She said in the first three months that the child was living with her and the Respondent in the United States, the child did not have any medical appointments.
When the child left Ms. R.'s home after those three months, Ms. R. was not able to see the child. Ms. R. testified that the Petitioner tried to see the child many times but was unable to do so. He would call the Respondent but she would not answer the phone. Ms. R. testified that she did not have the Respondent's phone number. 
The Petitioner, R. R. testified that he was living in Connecticut. He has two children, A. T. and S. R. T.. The Petitioner testified that he was present when the child S. was born in 2009. He testified that there were complications with the birth. He said that after the child's birth, the child lived with him in the Dominican Republic at his family's home. He testified that he was the primary caretaker of the child, although his parents helped him. The Respondent was recovering from complications at the birth. He said that on the weekends, they would go to the maternal grandmother's home. The Petitioner testified that for the first two years of the child's life, he was the child's primary caretaker. 
The Petitioner testified that he came to New York in March of 2012 on a fiancé visa with the expectation that he and the Respondent would get married. After he arrived, he realized that he and the Respondent would not be getting married, as she had a boyfriend and was pregnant with the boyfriend's child. 
The Petitioner saw the child often when he first arrived in New York in 2012. The last time he saw the child was in 2012 at his sister's home in Brooklyn. He had to return to the Dominican Republic after three months when his visa expired. Shortly before he had to leave the States, the Respondent "disappeared with the children." He said that after he returned to the Dominican Republic, neither he nor anyone in his family had a way to communicate with the child or the Respondent. 
The Petitioner testified that the Respondent threatened him over the phone. She said if he showed up at her home, she would send people to beat him up. He said that when he would have telephone contact with the Respondent, she would then block him. He would call her about the child. He tried calling the Respondent's four siblings, but he could not obtain information about the child. The Petitioner contacted the Respondent's father in 2013, but still was unable to get contact information about the Respondent. He also sought help from their mutual friends but was unsuccessful. 
On cross-examination, the Petitioner testified that ten years ago, he sent child support money to the Respondent, but the money was sent back. He said the Respondent said he should "shove it up my ass." He said that since they have been in court, he has not sent any child support or letters or cards or presents to the child. He said he did not do so because he does not have the Respondent's address. He also said that he had not asked for the ability to send the child a present. 
The Petitioner testified about his efforts to obtain the Respondent's address for the court case. At the time of his testimony, he said that he still did not know the Respondent's address. Asked why he did not ask for the Respondent's address, the Petitioner stated that the Respondent [*6]threatens him every time they speak. He also said that she changes her phone number every time he obtains it and calls her. The Petitioner stated that since he filed his petition, the Respondent has threatened him twice not to get close to the children.
The Petitioner testified that between 2012 and 2019, he did not have a phone number to reach his daughter and he did not have her address. The Respondent did not provide the Petitioner with any information about the child's academic development, her learning disabilities, or her medical needs. The Petitioner testified he did not send birthday gifts or cards or Christmas gifts because he had no address to send them to. 
Between 2012 and 2019, the Petitioner was trying to obtain a visa to come to the U.S. but was unable to get one. He was finally able to travel to the U.S. in May 2019. When he filed the petition in court in 2019, he obtained the aid of a private investigator. He appeared in court many times before the Respondent finally appeared. 
The Petitioner testified that he does not want to take the child away from her mother. He wants to see the child, however, and know that she is doing well. 
The Petitioner called the Respondent's husband, R. D. as his witness. Mr. D. testified that he lives in Florida [FN4]
with the Respondent and the following children: A.T., S.T., and A.D. He said that S. is 13 years old. He said that S. is home-schooled by her brother. Mr. D. testified that S. has special needs; she is a slow at learning and remembering things. 
Mr. D. stated that he paid for the Respondent's plane ticket to the Dominican Republic in order for her to bring the child to New York and he met the child when the Mother came with her to New York in February 2012. He and the Respondent were married in August 2012, and the two of them had a child together later that year. The Respondent brought a child support case against him at one point because they had an argument, but he testified that the child support case had "ended." He testified that he and the Respondent have always lived together since their marriage.
Mr. D. stated that he provided for S.'s financial needs, as well as those for the entire family, as the Respondent was not working. Mr. D. testified that he attended S.'s school events. Asked about S.'s doctor in Florida, Mr. D. stated that they had been in Florida for a year and did not have any doctors. When they were in New York, the Respondent took care of the child's medical needs, and he did not know the child's doctors. 
Findings of Fact and Conclusions of Law
Equitable estoppel may be used to prevent a litigant from asserting a right the litigant would normally have. As the Court of Appeals explained in Shondel J. v. Mark D., 7 NY3d 320, 326 (2006):
The purpose of equitable estoppel is to preclude a person from asserting a right after having led another to form the reasonable belief that the right would not be asserted, and loss or prejudice to the other would result if the right were asserted. The law imposes the doctrine as a matter of fairness. Its purpose is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a [*7]detrimental change of position (see generally Nassau Trust Co. v Montrose Concrete Prods. Corp., 56 NY2d 175, 184, 451 N.Y.S.2d 663, 436 N.E.2d 1265 [1982]).
The doctrine has often been used in the context of disputes over paternity: thus, a man may be equitably estopped from denying paternity if he has been holding himself out as the father of the child. See Mitches-Lewis v. Lewis, 204 AD3d 989 (2d Dept. 2022); Hugo O. v. Paola O., 129 AD3d 976 (2d Dept. 2015); Angelo A.R. v. Tenisha N.W., 108 AD3d 560 (2d Dept. 2013). Or a mother seeking to have a man designated as the child's father may be estopped from doing so if she has allowed someone else to fill the role of father for the child. See Karen G. v. Thomas G., 109 AD3d 915 (2d Dept. 2013). This Court has been unable to find any other cases in this jurisdiction in which equitable estoppel has been used to prevent a biological father from seeking visitation. However, in principle, there is no reason that the doctrine may not apply in this setting.
When the doctrine of equitable estoppel is invoked in a proceeding involving a child, case law has made clear that in making its determination, the court must factor in the best interests of the child. Shondel J. v. Mark D., 7 NY3d at 327; Isaiah A.C. v. Faith T., 43 AD3d 1048, 1048—49 (2d Dept. 2007) ("On the question of whether the proceeding is barred by equitable estoppel, the primary consideration is the best interests of the child"). In the instant case, the question before the Court is whether the Petitioner, the biological father of the child, should be estopped from seeking visitation with the child in the child's best interest.
The Respondent's position, as well as that of the Attorney for the Child, is that the Petitioner should be estopped from seeking visitation as he has had no contact with the now thirteen-year-old child since she was approximately two and one-half years old. According to the Respondent and to the Attorney for the Child, the child now only knows the Respondent's husband as her father.
The Petitioner does not dispute that he has not had contact with the child since she was a toddler, but he asserts that the lack of contact was not of his doing, but rather, that the Respondent had refused contact with him from 2012 to 2019, when he was in the Dominican Republic. He contends he was not able to locate the Respondent until he came to the United States and commenced this proceeding. The Respondent's testimony was that the Petitioner "disappeared" from 2012 to 2019. 
There is no dispute that the Petitioner was intimately involved in caring for the child during her first two years of life. Both the Petitioner and Respondent testified that the child was born in the Dominican Republic where they were both living and that during the child's first two and one-half years of life, the Respondent travelled back and forth between the Dominican Republic and the United States, leaving the child for long periods of time in the Petitioner's care.
There is also agreement that the Respondent obtained a fiancé visa for the Petitioner, enabling him to come to the United States in 2012. Moreover, both parties agree that the Petitioner had to return to the Dominican Republic after 90 days when his visa expired, as the Respondent and Petitioner were not going to be married. The Respondent had already started a new relationship with the man who is now her husband. 
Where the Respondent's and Petitioner's evidence diverges is in what happened after 2012. According to the Respondent, she and the Petitioner were in contact until the child was [*8]four years old. At that time, the Respondent asked the Petitioner for money to pay for an aide for the child as she had been diagnosed with a learning disability. She claimed that the Petitioner refused to provide any money and said he wanted nothing more to do with the child. She said that after that, she never heard anything from the Petitioner.
In contrast, the Petitioner testified that after he returned to the Dominican Republic, neither he nor anyone in his family was able to communicate with the Respondent. He testified to the efforts he made to contact the Respondent by speaking with her family members and friends. He also testified that he had sent money for the child's support to the Respondent and that she returned the money to him. He said that between 2012 and 2019, he did not have a phone number or an address for the Respondent which is why he was unable to send any letters or gifts to the child. He also said that when he did have a phone number for the Respondent, and he called her, she would then change her number.
The Court finds the Petitioner's testimony about the period of time between 2012 and 2019 to be more credible than that of the Respondent. The Petitioner's sister, with whom the Respondent lived when she first came to New York with the child, testified that, although the Respondent lived with her for three months, she was unable to see the child after the Respondent left her home. Furthermore, the Court notes that when the Petitioner first filed his petition with the Court in June 2019, he did not know where the Respondent lived. The Petitioner was compelled to use a private investigator to find the Respondent. Most significantly for this Court, the Respondent failed to appear in court after she was served and even after a stayed warrant was issued. It was only after a warrant was executed and she was brought to Court that she appeared. The Respondent's actions at the commencement of this proceeding would seem to corroborate the Petitioner's testimony that she blocked his calls and "disappeared" from his life with the child. 
The most important consideration for the Court, however, is not the equities between the Respondent and Petitioner, but rather the child's best interests. Shondel J. v. Mark D., 7 NY3d at 330 ("the issue does not involve the equities between the two adults; the case turns exclusively on the best interests of the child"). Both the Respondent and the Attorney for the Child assert that the child does not remember the Petitioner and that the Respondent's husband fills the role of father to her. 
Yet neither the Respondent nor the Attorney for the Child has presented any evidence indicating that having a relationship with the Petitioner would be detrimental to the child's best interests. The Petitioner, himself, stated on the record that he was not asking to remove the child from the Respondent's care, but rather that he wanted to see the child and have a relationship with her. See Denise R.-D. v. Julio R.P., 179 AD3d 704, 705 (2d Dept. 2020) (holding that equitable estoppel not available where there was no showing that the child would suffer harm if a genetic marker test was ordered, as there was no "indication that the child's relationship with the husband [of the mother] needed protection from a determination as to whether the putative father was the biological father"). It is undisputed that the Petitioner is the child's father. Significantly, the Petitioner is on the child's birth certificate and she carries his name. At some point, the child is going to wonder and ask about her biological father. The Respondent and Attorney for the Child have failed to present any evidence that it would not be in the child's best interest to have the opportunity now to have a relationship with the Petitioner. 
Even if the Respondent's husband serves as the child's psychological parent, that does not preclude the Petitioner from having a relationship with the child as well. See Ruby M.M. v. Moses K., 18 AD3d 471, 472 (2d Dept. 2005) (reversing order and granting petition for filiation as "the facts establishing that the respondent is the father of the subject children are virtually undisputed, and he did not establish that such a determination would disturb any relationship the children may have had with any other father figure"). In 2023, there is no longer any stigma attached to children being born outside of marriage. The Court sees no reason, and none was presented to the Court, as to why the child would not benefit from having a relationship with her biological father, as well as with the husband of her mother.
For these reasons, the Court is denying the motion to equitably estop the Petitioner from seeking visitation with the child. The matter will be scheduled for a conference with the Court in order to set a parenting time schedule for the Petitioner.
Notify parties and counsel.
Dated: July 27, 2023
Honorable Judith Waksberg
Judge, Family Court

Footnotes

Footnote 1: The hearing, which took place virtually, was held on the following dates: 10/22/21; 5/11/22; 5/23/22; 10/14/22; 11/1/22; and 5/8/23. (Two other dates in which the hearing was scheduled were converted to conference dates — 3/29/23 and 5/3/23.)

Footnote 2: The Court accepted the representation of the Attorney for the Child that the child had no memory or knowledge of the Petitioner and that she considered the Respondent's husband to be her father. In light of that, the Court determined not to hold a Lincoln hearing. It would not be appropriate for the child to learn of her Father's existence through the Court. See D.S.S. ex rel. Tianna R. v. Timothy C., 114 AD3d 860, 861 (2d Dept. 2014).
Footnote 3: On cross-examination, the Petitioner's attorney attempted to have the child's birth certificate entered into evidence, but as it was not translated into English, the Court did not admit it.

Footnote 4: At some point during the pendency of the case, the Respondent, Mr. D., and the Child relocated to Florida.