C.M. v S.J. (2024 NY Slip Op 51653(U))

[*1]

C.M. v S.J.

2024 NY Slip Op 51653(U)

Decided on September 24, 2024

Family Court, Kings County

Markoff, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 24, 2024
Family Court, Kings County

C.M., Petitioner,

against
S.J., Respondent.

File No. 234219

Joy A. Fasanya, Esq. and Kimberly F. Tayeb, Esq. appeared on behalf of the Office of Corporation Counsel pursuant to Uniform Interstate Family Support Act for the petitioner. Leila Maldonado, Esq. appeared on behalf of the respondent. Maia A. Smith, Esq. appeared on behalf of the child.

Robert A. Markoff, J.

Procedural History
On August 5, 2015, the petitioner mother (hereinafter the mother) filed a paternity petition against the respondent S.J. alleging that he was the biological father of the child. By order of filiation dated May 24, 2016, the Support Magistrate (Fasone, S.M.) adjudged and declared that the respondent was the father of the subject child. Thereafter, the respondent filed objections to the order of filiation. By order dated June 28, 2016, the Family Court (Dean, J.) in effect, granted the respondent's objections to the order of filiation to the extent that it directed the vacatur of the order of filiation, and remittal to the Support Magistrate to refer the case to a Family Court Judge to determine whether the doctrine of equitable estoppel applies to prevent the mother from asserting biological paternity against the respondent. In an order dated October 31, 2016, the Family Court (Mulroy, J) dismissed the prior proceeding without prejudice based upon the mother's failure to appear and prosecute. The order of filiation was thereafter vacated.
On February 8, 2021, the mother, through the Office of the Corporation Counsel, commenced this child support proceeding against the respondent under the Uniform Interstate Family Support Act (UIFSA). The respondent appeared by counsel and, as he had done in the prior proceeding, asserted the defense of equitable estoppel based upon his allegations that, inter [*2]alia, the child recognized another man as her father. The Support Magistrate referred the matter to a Family Court judge for an equitable estoppel hearing. Thereafter, this Court held an equitable estoppel hearing on August 4, 2023, August 7, 2023, and June 18, 2024. The Court interviewed the child in camera on June 26, 2024.
Relevant Hearing Testimony
Marvina Brewster, Esq., an attorney, testified, inter alia, that on May 24, 2016, she was accompanying and observing the respondent's lawyer Leila Maldonado, Esq. during the prior court proceedings. Ms. Brewster testified that, during a break in the proceedings, she witnessed a man sitting with a young child in his lap, and that she saw the mother talking to this man. At some point, this man and the respondent engaged in an argument that caught the attention of court officers. As the unknown man stood up and walked away, the child started yelling "daddy, daddy, daddy." The child tried to follow the man to the elevator, and the man told the girl, "you can't come with me." At the time, he respondent then asked the Ms. Brewster whether she "heard [the child say] that."
The respondent testified that he and the mother were involved in a relationship from approximately 2009 through 2012, and that, after the relationship ended, he had not seen the mother again until court proceedings were commenced in 2015. Notably, the respondent testified that he was served with process papers by the same unknown man that accompanied the mother in court. The respondent testified that during a break in court proceedings in May 2016, this man told him that, "you should take care of your child," which precipitated an argument. The respondent testified that he observed the child sitting with both the unknown man and the mother. When the man was escorted off the floor, he heard the child say that she wanted to go with "daddy." The respondent testified that he heard the mother tell the child "shhhh." When the respondent heard the child referring to the man as "daddy" three times, he asked Ms. Brewster whether she heard the child say that, and Ms. Brewster confirmed that she had. The respondent later learned through social media that the man in court was the mother's husband J.W. The respondent gave foundational testimony regarding exhibits 1-7, which were photographs depicting, among others, J.W., the mother, and the child. The respondent testified that he does not speak to the child or the mother, has no knowledge about the child's life, and that no one in his family has any contact with the child.
The mother testified that she believes that the respondent is the child's father because he was the only person with whom she had sexual relations at the time the child was conceived. The mother testified that she met J.W. when the child was 6 or 7 months old, and that she and J.W. did not have sexual relations until the summer of 2014. The mother and J.W. married in December 2016.
The mother testified that she filed the first paternity petition against the respondent in 2015, and she had J.W. serve the process papers upon the respondent. The mother also acknowledged that J.W. accompanied her to court appearances. She testified that after the hearing concluded, she and J.W. moved to South Carolina, and did not receive any further notices to appear in court. The mother explained the significance of the photographs introduced as the respondent's exhibits. She testified that Exhibit 1 is a photograph from her Facebook page depicting herself, J.W., the child, and her son at the time of her and J.W.'s wedding. Exhibit 2 is a photograph posted on the mother's Facebook page depicting herself, J.W., and the child at the child's third birthday party. Exhibit 4 is a photograph depicting J.W. and the child and it reads "Happy Father's Day." The mother explained that she, her children, J.W., and J.W.'s children [*3]celebrate Father's Day every year. Exhibit 6 depicts J.W.'s father whom the child refers to as "grandpa." The mother explained that her children referred to J.W.'s father as "grandpa."
The mother further testified that the child was made aware of the respondent through conversations, and through the child's relationship with the respondent's daughter, L.J. The child has her own phone, and regularly speaks to L.J. L.J. has visited the child in person in South Carolina, and the child refers to her as "Sissy." The mother testified that she and J.W. "sat" the child down and explained that L.J. is her sister because they share the same biological father. She was explained that she has a biological or "real" father that is the respondent and that J.W. is the father she lives with. According to the mother, the child asked questions about the respondent which the mother tried to answer to the best of her ability.
J.W. testified that he is married to the mother and that they have been residing together in South Carolina for over 5 years. Before that, he lived in Brooklyn while attending college. He met the mother in the summer of 2014. At that time, he was caring for his own daughter. During that summer, he and the mother would meet in the park with their respective children. The subject child was around a year old when he first met her. He recalled meeting the respondent at the courthouse but was not sure what year the meeting occurred. He recalled the respondent arguing with him, and not being sure why the respondent was angry with him, given that he had nothing to do with the case. J.W. testified that he and the mother were just friends at that point. According to J.W., the child did not refer to him as "daddy" at that time as she was not yet verbal, and he was not around the mother so much that the child would have called him that at that time. J.W. admitted that the child now refers to him as "daddy" but did not recall when she started doing so.
J.W. testified that his relationship with the mother became more serious when he was preparing to move to South Carolina to live close to his own family. The mother and J.W. decided to move together to South Carolina, and he has lived with the mother and her children ever since. The mother and J.W. married in December 2016. J.W. testified that he met the respondent's daughter L.J. a couple of times. He has spoken to her through facetime calls that L.J. had with the child, and L.J. introduced herself as the child's sister. He has met L.J. in person. At some point in 2022, L.J. took the child to a slime park. J.W. denied that L.J. ever visited in South Carolina. J.W. testified that he was involved in a conversation with the child about L.J. being her sister in that they shared the same father. He explained to the child that he is not her biological father.
J.W. testified that the child refers to him as "daddy," that he loves the child, and that he takes her to doctor appointments, reads to her, helps with her homework, and attends parent-teacher conferences. He also testified that the child celebrates Father's Day for him. 
Legal Analysis
"'Paternity proceedings, brought pursuant to article 5 of the Family Court Act, have a twofold purpose: to determine paternity and to secure support for the child'" (Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d 1067, 1068 [2d Dept 2017], quoting Matter of Department of Social Servs. v Jay W., 105 AD2d 19, 23 [2d Dept 1984]).
Pursuant to Family Court Act § 532(a), "[t]he court shall advise the parties of their right to one or more genetic marker tests or DNA tests and, on the court's own motion or the motion of any party, shall order the mother, her child and the alleged father to submit to one or more genetic marker or DNA tests . . . to aid in the determination of whether the alleged father is or is not the father of the child. No such test shall be ordered, however, upon a written finding by [*4]the court that it is not in the best interests of the child on the basis of . . . equitable estoppel . . . " (see Matter of Carlos O. v Maria G., 149 AD3d 945, 946 [2d Dept 2017]; Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069). "By providing a 'best interests of the child' exception to mandatory biological tests of disputed paternity, Family Court Act § 532 requires the Family Court to justify its refusal to order biological tests when paternity is disputed" (Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069; see Matter of Shondel J. v Mark D., 7 NY3d 320, 329 [2006]). Thus, "[w]here a party to a paternity proceeding raises an issue of equitable estoppel, that issue must be resolved before any biological testing is ordered" (Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069).
"The purpose of equitable estoppel 'is to prevent someone from enforcing rights that would work injustice on the person against whom enforcement is sought and who, while justifiably relying on the opposing party's actions, has been misled into a detrimental change of position'" (Matter of Derrick H. v Martha J., 82 AD3d 1236, 1238 [2d Dept 2011], quoting Matter of Shondel J. v Mark D., 7 NY3d at 326). "Thus, 'a man who has held himself out to be the father of a child, so that a parent-child relationship developed between the two, may be estopped from denying paternity,' in light of the child's justifiable reliance upon such representations, and the resulting harm that the man's denial of paternity would engender" (Matter of Derrick H. v Martha J., 82 AD3d at 1238, quoting Matter of Shondel J. v Mark D., 7 NY3d at 326; see Matter of Shawn H. v Kimberly F., 115 AD3d 744, 745 [2d Dept 2014]).
As relevant to this case, "the doctrine of equitable estoppel may be used by a purported biological father to prevent a child's mother from asserting biological paternitywhen the mother has acquiesced in the development of a close relationship between the child and another father figure, and it would be detrimental to the child's interests to disrupt that relationship" (Matter of Juanita A. v Kenneth Mark N., 15 NY3d 1, 6 [2010]; see Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069). 
"It is well settled that the party seeking to prove paternity, whether by [equitable] estoppel or otherwise, must do so by clear and convincing evidence" (Matter of Montgomery County Dept. of Social Servs. v Trini G., 195 AD3d 1069, 1070 [3d Dept 2021]; Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d 1067 [2d Dept 2017]).
Here, the respondent, i.e., the purported biological father, established with clear and convincing evidence, that the petitioner mother acquiesced in the development of a close relationship between the child and a father figure, i.e., J.W. It is undisputed that J.W. has been in the child's life since the child was under 1 year old, that the child has been residing with J.W. and the mother in South Carolina for years, and that the child refers to J.W. as "daddy." This court credits the testimony of the respondent and Ms. Brewster that the child has referred to J.W. as "daddy" since as early as May 2016 when the parties were in court. Even according to his own testimony, J.W. performs various parental functions, including taking the child to the doctor, attending parent-teacher conferences, and helping the child with her homework. Mr. Webb and the child celebrate Father's Day and other holidays together. Additionally, the evidence, including J.W.'s own testimony, established that the child refers to J.W.'s father as "grandpa" (see Matter of Smythe v Worley, 72 AD3d 977, 979 [2d Dept 2010] [finding equitable estoppel where, inter alia, child developed relationships with putative father's family members]). It was clear from the testimony that J.W. loves and cares for the child as a daughter. In contrast, the respondent demonstrated, and it was undisputed, that he has never met or spoken [*5]with the child, and, therefore, has no relationship with her.
The fact that the child has developed a close bond with J.W. and considers him to be a father figure does not, however, end the inquiry as to the application of equitable estoppel. The doctrine of equitable estoppel will be applied only where its use furthers the best interests of the child (see Matter of Juanita A. Matter of Brandon J. v Leola K., 229 AD3d 918 [3d Dept 2024]; Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069). To demonstrate the application of equitable estoppel, the respondent must also show, with clear and convincing evidence, that a determination that he is in fact the father would disturb any relationship the child has with J.W. (see Matter of Juanita A. v Kenneth Mark N., 15 NY3d at 6; see Matter of Suffolk County Dept. of Social Servs. v James D., 147 AD3d at 1069). In this regard, the court must consider whether the child would "suffer irreparable loss of status, destruction of her family image, or other harm to her physical or emotional well-being if this proceeding were permitted to go forward" (Matter of Derrick H. v Martha J., 82 AD3d 1236, 1239 [2d Dept 2011][internal quotation marks and citations omitted]; see Matter of Brandon J. v Leola K., 229 AD3d 918, 921 [3d Dept 2024]). "The issue of equitable estoppel does not involve the equities between [or among] the . . . adults; the case turns exclusively on the best interests of the child" (Matter of Felix O. v Janette M., 89 AD3d 1089, 1090 [2d Dept 2011]; see Matter of Carlos O. v Maria G., 149 AD3d 945, 946 [2d Dept 2017]).
Here, the respondent failed to show, with clear and convincing evidence, that if he were determined to be the child's father that the child's relationship with J.W. would be disturbed, or that the child would suffer any other irreparable loss of status, destruction of family image or any other harm to her physical or emotional well-being. In this regard, the mother and J.W. together sat down with the child and explained that the respondent is her biological father, and that J.W. is, in effect, her stepfather. The mother testified that the child expressed curiosity about the respondent and wanted to know more about him. Additionally, the mother and J.W. credibly testified that the respondent's own daughter L.J. reached out to the child and has since established a sibling relationship with her. The child and L.J. regularly speak to each other by phone and video calls, the child refers to L.J. as "Sissy," and L.J. has met the child in person.
Additionally, the mother has been asserting the respondent's biological paternity since 2015 and even recruited J.W. in her efforts to do so. J.W. served the 2015 petition upon the respondent in the prior proceeding and attended court proceedings with the mother. Indeed, the respondent testified that he and J.W. engaged in an argument in which J.W. took issue with the respondent's denial of paternity and refusal to pay child support. The litigation history shows that the mother and J.W. never intended the child to believe that J.W. was her father, and that they have been insisting on the respondent's biological paternity for years. The totality of the evidence shows that while the child has a strong loving relationship with J.W. as her stepfather, she would not suffer any harm resulting from a determination that the respondent is her father. Indeed, the child has already been informed that the respondent is her biological father. Finally, it should be noted that the Attorney for the Child has consistently supported the petition seeking an order of filiation and support against the respondent. Thus, the respondent failed to establish, by clear and convincing evidence, that it is in the child's best interest to apply the doctrine of equitable estoppel.
Accordingly, the respondent, the child, and the mother shall submit to DNA testing to determine the respondent's paternity. 
Dated: September 24, 2024
Brooklyn, NY
ENTER
Hon. Robert A. Markoff
Kings County Family Court